LETTIE ADAMS ET AL. v. NANNIE KENDRICK, Appellant.—11 S. W. (2d) 16.

Division One, November 16, 1928.

312

*Frank B. Klepper* and *E. G. Robison* for appellant.

*Pross T. Cross, Gerald Cross* and *Davis & Ashby* for respondents.

GENTRY, J.—This is a contest over the will of Wm. H. Hauger, deceased (hereinafter for convenience called testator), late of De-Kalb County, Missouri; it was instituted in the circuit court of that county, but taken on change of venue to Caldwell Circuit Court, where an amended petition was filed. A trial before a jury in the last mentioned court resulted in a verdict for plaintiffs, setting aside the will, and defendant has appealed.

In the usual form, the amended petition alleged the death of testator on August 4, 1923; that he owned a 'arge amount of real estate and personal property situated in DeKalb County; that he left no widow, but six children as his heirs at law; that the plaintiffs Bettie Adams, William Hauger, Ollie Hauger, Newton Hauger and Roy Hauger, and defendant Nannie Kendrick were his only heirs; that his will was duly probated in DeKalb County, and that Nathan S. Goodrich, the nominated executor, duly qualified and entered upon the discharge of his duties. The reasons assigned for the contest of this will, as stated in the amended petition, are (1) unsoundness of mind of the testator, (2) fraud, coercion, undue influence and slanderous statements of defendant Nannie Kendrick and her husband and others acting in their behalf made to testator concerning plaintiffs, and (3) the "insane delusion that his son, the oldest child, William Hauger, was not his child, but was the fruit of an illegal, indecent and unlawful act of intercourse between his wife and another." On motion of defendant, the court required plaintiffs to state in the petition the insane delusions possessed by testator, and this was done in the amended petition, as above set out.

Defendant Nannie Kendrick answered denying the allegations of the petition, and in apt terms alleged that testator was of sound and disposing mind and memory and prayed to have the paper writing,

so admitted to probate, declared to be the last will and testament of William H. Hauger, deceased.

It is conceded that the wife of testator, Nancy J. Hauger, predeceased him a few years, and also that her death occurred prior to the execution of the alleged will, and that the plaintiff Lettie Adams (whose name was incorrectly written as Bettie Adams) William Hauger, Ollie Hauger, Newton Hauger, Roy Hauger and defendant Nannie Kendrick were the children and only heirs of testator. Testator died at the age of seventy-nine, a resident of DeKalb County, the owner of real estate worth $7,000 and $6,275.90 cash in bank, besides other personal property. It is also conceded that shortly after the death of testator, the paper writing referred to was presented to the Probate Court of DeKalb County and admitted to probate as testator's last will and testament. It is further conceded that testator died in the Ainsworth Hospital at St. Joseph, having been taken there for a surgical operation a few days prior to his death from his home in Cameron, Missouri. It should also be stated that while Cameron is situated in Clinton County, the portion of the city where testator resided is over the line in DeKalb County.

Mr. Livingston, an attorney, a witness for defendant, testified that he had a conversation with testator regarding the preparation of the will; that testator told him that he wanted to give all of his property to defendant Nannie Kendrick, except one dollar each to the plaintiffs, his other children. The will was executed in the Farmers Bank of Cameron, and it was witnessed by Henry B. Cooper, T. W. Partin and John A. Livingston, all of whom resided in Cameron at that time. Messrs. Cooper and Partin were then connected with that bank, but Mr. Partin has since moved to California and his exact residence was and is unknown. The will was typewritten, and that perhaps accounts for the fact that the name of one of testator's children was incorrectly written, "Bettie Adams" instead of Lettie Adams. There was some difference of opinion as to the correct way of spelling testator's name; sometimes he spelled it "Hauger" and sometimes "Hager." Mr. Livingston testified that he "would consider him [testator] of reasonably sound mind. He had a few peculiarities." Mr. Livingston was of the opinion that testator simply gave him the names of the plaintiffs, without any endearing terms, and then spoke of defendant as "my beloved daughter, Nannie Kendrick." In giving instructions for the preparation of the will, testator said that all of his children seemed to be against him except Nannie Kendrick. Testator said that he wanted Nathan S. Goodrich, of Cameron, to act as his executor. In explaining that his children were against him, he said they had brought some suits against him and William had tried to steal his mail. In 1919 testator complained to this attorney and to Hon. H. F.

Lawrence, then a banker in Cameron, that his son William was getting his mail, and had Mr. Livingston prepare an affidavit in regard to the loss of a pension check. Testator said that somebody had taken a pension check of his out of one of his letters, and that he thought it was his son William, who had the same name. Mr. Livingston, as notary public, took the acknowledgment of testator to a deed in July, 1918, whereby testator's home, consisting of a residence and between seven and eight acres of ground in the suburbs of Cameron, was conveyed by testator to defendant in consideration of one dollar and love and affection. This deed reserved a life estate in testator, was delivered, but not recorded until after the death of testator.

The witness Cooper, vice-president of the Farmers Bank of Cameron, testified that he had known testator for thirty years and that testator signed the will in question at the Farmers Bank of Cameron. He also testified, as did Mr. Livingston, that this signing was in the presence of the three witness s, Livingston, Cooper and Partin, and that all three of the witnesses signed in the presence of the testator and at his request. This witness testified that testator was of sound mind at that time, and that he never knew of his having any peculiarities. He said that his associations with him were in a business way, not social, and that he knew nothing of testator possessing any delusions. After reading the will in evidence, which is dated April 28, 1920, defendant rested. The will is as follows:

"I, William H. Hauger, of the County of DeKalb, and State of Missouri, being now in good health and of sound mind and body, but sensible to the uncertainties of life and desiring to make disposition of my property and affairs while in health and strength, do hereby make, publish and declare the following to be my last will and testament, hereby revoking and cancelling all other or former wills by me at any time made.

"First: I direct that my Executor, hereinafter named, shall pay all my just debts and funeral expenses and the expenses of my last sickness, and I request that my remains be placed in my lot in the Packard Cemetery near the City of Cameron, Missouri.

"Second: I give, devise and bequeath to my children, William Hauger, Newton Hauger, Bettie Adams, wife of Oscar Adams, Roy Hauger and Ollie Hauger, the sum of one and no/dollars ($1.00) each, and as each of the above have already received from me more than their just share of my estate, I direct that in no event shall they receive any further portion of the same.

"Third: I give, devise and bequeath to my beloved daughter, Nannie Kendrick, wife of John Kendrick, of the County of Caldwell, State of Missouri, all of the rest, residue and remainder of my

property, both real and personal or mixed of whatever kind or description, to be hers absolutely and in fee simple.

"The above bequest and devise is made to my said daughter in recognition of the care and attention she has bestowed on me during my life time and in recognition of the fact that she has not been compensated for said love, care and affection.

"Fourth: I hereby make, constitute and appoint my good friend, Nathan S. Goodrich of Cameron, Missouri, Executor of this my last will and testament.

"In witness whereof I, William H. Hauger, have to this my last will and testament consisting of two sheets of paper typewritten, subscribed my name this 28th day of April, 1920.

WILLIAM H. HAUGER.

"The foregoing instrument consisting of two (2) pages was at the date thereof signed and declared by the said William H. Hauger to be his last will and testament in the presence of us, who, at his request, in his presence and in the presence of each other, have subscribed our names as witnesses thereto.

HENRY B. COOPER, of Cameron, Missouri.

T. W. PARTIN, of Cameron, Missouri.

JOHN A. LIVINGSTON, Cameron, Missouri."

In behalf of plaintiffs, the evidence took a wide range, and some of it was irrelevant. Testator was a farmer and owned one hundred acres of land in DeKalb County. After defendant had married and moved with her husband to another farm, testator had a controversy with his wife, which resulted in a separation and a divorce suit, but the divorce suit did not come to trial, owing to a written agreement, termed a "settlement," between the parties which was dated November, 1896. By the terms of this agreement, testator conveyed his real estate to Moss Jones, as trustee for his wife and children, until the youngest child became twenty-one years of age. Upon his attaining his majority, the title to the real estate was then to pass one-half to the wife during her lifetime and at her death to their children, and the other half to testator. Testator refused to live with his wife, but the evidence tends to show that he did live a part of the time in the same house with his family. Under the terms of this agreement, certain personal property, consisting of live stock and farming implements, was left by testator on the home place to be used by the family. Testator moved to a small house several miles away, spoken of as a "shanty," and engaged in the sawmill business some nine months of the year and in the threshing business some three months of the year. At the age of thirteen testator's son, Roy Hauger, left home and lived with testator during the time that he conducted the sawmill and threshing machines, some thirteen years.

The visits of testator to his home, as might be expected, were not pleasant, disputes and controversies arising, in which testator claimed that his wife and sons were disposing of some of the hogs in violation of the terms of this agreement. He became so angry that he got his revolver and threatened to kill every one of the family, but his wife took the revolver from him. One of the children testified that testator also accused his wife of being untrue to him and said he would shoot her and all of them would have to wade in blood knee-deep. Once (time not shown) testator struck his wife, knocking her down and then claimed that the wife struck him. However, their differences were "patched up," as expressed by one of the witnesses, the wife agreeing to forgive him for the children's sake. When the youngest boy became of age in 1910, testator and his wife were unable to agree on a division of the land, so testator brought suit against her and commissioners were appointed who divided the land between them, giving the wife the improvements and a part of the land and testator the remaining part.

Testator seems to have been an industrious man and a very close man, by reason of which he accumulated money and purchased other real estate, taking the title in the name of his sons Roy, Ollie and Newton Hauger, so he claimed. Later, the sons disputed his title and testator brought suits against them. These suits did not tend to improve the unfortunate condition then existing in this unfortunate family. As stated, testator was very close in his dealings with his family, and objected to his wife giving defendant a feather bed when she married, and later objected to her giving the small children of defendant bread and butter when they visited the home. Testator refused to attend the funeral of defendant's little girl, who died some years before the death of testator, so Mrs. Adams claimed. Mrs. Adams further testified that testator said that he had caught the uncle of his daughter Nannie (defendant) in her room and in bed with her and that he wished to God he had shot him. He was so indignant over this that he struck his fist against the table, knocking some of the plates to the floor. The date of this alleged incident does not appear. After the trial of the lawsuit with his son Roy, testator drew a pistol and threatened to kill the attorney who represented testator, but relatives prevented him from doing so. Testator did not attend the funeral of his wife, but shortly afterwards he wanted to get the family Bible so that he could destroy it and in that way show that he had never named one of his sons William.

Testator had been a soldier in 1861-65 and drew a pension, and in 1911 his wife endeavored to get half of this pension; this caused the bitterest of feelings, as the four boys sided with the mother, Mrs. Adams with the father, and defendant claimed to have been neutral in that controversy, as she had married and was living with her

husband. In 1919, testator claimed to have lost one of his pension checks and accused his son William of getting it from the mail and cashing it, and threatened to send his son to the penitentiary. William denied getting the check, but testator was very stubborn about the matter and made complaint to the pension authorities. A pension examiner visited Cameron and it was discovered that the check had been received by testator, indorsed by him and placed to his credit in the bank.

Some nineteen years before his death, testator shot at Harrison Jones, but Jones escaped unhurt. The evidence is somewhat vague as to this difficulty. In a day or two, Jones claimed to have met testator and that the latter cried. Some years later, Jones met testator in the vault of the Farmers Bank of Cameron and testator did not speak to him, or recognize him. When told who Jones was, testator cried. Testator had a lawsuit with the father of Jones. In 1920 testator made a contract with J. C. Sloan to erect a monument in Evergreen Cemetery at Cameron, and the order for the monument misspelled testator's name; but testator paid for the monument.

Some twenty or twenty-five years before the death of testator, while visiting at the home of Mrs. Lena Ulrick, in a rage, testator said that William was not his boy and used considerable profanity to emphasize his statement. Evidently this witness did not think much of the emphatic way testator had of saying that, for she said he was always using profanity, "cussing his wife, as it seemed natural for him to do." She also heard testator curse his boys while in a passion, which was about the time they had their lawsuits. She also testified that defendant did not come to wait on her mother during her last illness, although requested to do so.

About four years prior to his death, testator moved to Cameron, purchased a house and some ground and lived in that house until the day he was taken to the hospital in St. Joseph; Mr. and Mrs. Hamlet lived in a part of the house, Mr. Hamlet being about the same age of testator. These old people testified that testator had what in their opinion were "apoleptic spells." They said that testator would fall over, but in a few minutes would get up and be all right. During those four years, defendant visited her father every three or four weeks, spending one to two hours with him at each visit. He testified that he heard defendant say that the boys were planning to steal all they could from him. After such visit testator was excitable and restless. When assured by Mr. and Mrs. Hamlet that his boys were good boys and were not trying to steal from him, testator said that they were, that he hated them and that they were traitors. More than once testator told Hamlet that if the boys came on the place to drive them off, and if they did not leave to call the marshal, and if

they did not then go to shoot them. He also said that he would use his gun on the boys if they came there. After one of defendant's visits to testator, testator said they were all against him. While testator resided in Cameron, the wife of plaintiff Ollie Hauger brought testator a pie, which she had made, but he refused to eat it and said that he would not allow his dog to eat it. When urged to eat the pie and told that it had been made by his daughter-in-law, testator again stated that he would not eat it and would not allow his dog to eat it, but that he would fix it so that neither one of them would touch it. And plaintiff Newton Hauger brought two young squirrels to testator's home in Cameron, properly dressed and wrapped in clean white paper, and gave them to testator, but he refused to accept of them, saying that he could buy what he wanted.

Testator was interested in machinery and during the last four years of his life spent a good deal of his time working in the blacksmith shop of one Blueholtz in Cameron. While he worked regularly there, he was not employed in that shop, but as expressed by one witness, "just tinkered around there a good deal." He worked in that shop up until a few days before he was taken to the hospital, being a good wood workman and also a good iron workman. He kept his money deposited in the Farmers Bank of Cameron and looked after the accumulation of interest on his deposit. During these four years, testator complained about his health a good deal, though he was not confined to his house. He bought his own groceries and the few articles he wanted in the house and did some of his own cooking.

At one time, the date not disclosed, testator had his wife and three sons prosecuted for stealing apples on some of his ground, but they were not convicted. In talking to one party testator said that when he died he was going to leave everything to the town, so that when the town clock struck everybody would remember him.

A few years before his death testator failed to recognize his daughter, Mrs. Adams, and asked who she was; and he accused her of not speaking to him because she wanted his money. This was after defendant began going to see testator. While living alone, testator became very fond of a little dog named Teddie and he said that Teddie could tell a Democrat from a Republican.

To the witness Buck, testator stated in 1920 that defendant told him that his son Ollie had come to town to get what stuff he had, but that he had a good gun or two to protect himself. To this witness testator stated that the wife of defendant Ollie tried to poison him by baking a pie for him, but he refused to eat it and would not let his dog eat it. Testator at different times complained about his children not visiting him enough and made ugly remarks about all of them, threatened to cut all of them out of his estate. Then he said that he was going to give all he had to defendant, as all the others

were against him. Testator several times said that he had $90 worth of tools stolen from him and he intimated that some of his children got them. During the time that testator felt kindly toward his daughter Mrs. Adams, she visited him, cleaned house for him and cooked food for him. She tried to bring about a reconciliation between testator and his wife and sons, but her efforts were unsuccessful.

During the Civil War testator received a sunstroke and a bayonet wound in the check, from which he often complained to the members of his family. While engaged in his threshing machine operations he and his threshing machine fell through a bridge and testator was found lying in the bed of the creek, bleeding from a wound on the head and his body partly covered with water and sand. He often complained that his head was injured by reason of that fall. One summer afternoon, while operating his threshing machine, testator was overcome by the heat and had to be taken to the shade of the tank wagon, where he remained all afternoon. These injuries, in connection with his unfortunate disposition, resulted in testator having crying spells whenever he had trouble with anyone. At times not disclosed by the record testator would stay in bed or lie on the bed almost a week at a time, eating very little. After engaging in a violent fuss with his family, testator would sometimes make up and ask his wife to excuse him, saying that he did not know what he had done, that his mind had not been right since he had the sunstroke in the army. The language used by testator in abusing his wife and children was of the most reprehensible character, too ugly to repeat. One day when his wife prepared a turkey dinner for the relatives testator refused to eat anything, saying that he would not eat any of her "damned poison." But after the family had left the table testator went into the dining room and partook of the turkey.

Plaintiff Roy Hauger tried to bring about a reconciliation between testator and his wife, but was unsuccessful. After Roy visited his mother a few times, testator complained that Roy was against him. To Roy as well as to others, testator stated that William was not his son, but was the son of Bill Funk. Roy noticed his father continually talking to himself and in a loud tone of voice and also testified to the crying spells which he had.

During the last few years of his life, members of his family sent baked chicken and other meats to testator, but he refused to eat them. It was testator's habit to keep liquor in his house and around his sawmill, from which he partook regularly, though he did not get under the influence to any extent. As expressed by one witness, he could drink a good deal of it and still "keep on his feet."

In behalf of defendant, Drs. M. L. Peters, J. A. Franklin and J. C. Bowman testified that they were acquainted with testator, had known

him for years and believed him to be of sound mind. These physicians also testified that testator was suffering with kidney and bladder trouble, also Bright's disease and hardening of the arteries and that at the time testator was sent to the hospital he was suffering with catarrhal condition which caused roaring in his ears; but they never heard of his having any spells on the street or any other place. They further stated that they found the condition of his clothing and bedding to be filthy. Defendant offered evidence tending to show that the falling through the bridge by testator with his threshing outfit did not result in any serious injury. Other witnesses, having had acquaintance with testator for many years, and dealing with him prior to the time of his moving to Cameron, gave it as their opinion that his mind was sound and his judgment good. The witnesses Owen and Sullivan testified to his statement that he expected to give all of his property to defendant, almost all of it. Some of these witnesses testified that plaintiffs Ollie and Roy Hauger spoke against testator. To the witness Thomas, testator said that he intended to give all his property to defendant; this was in the summer of 1919; and to the witness Packer, testator stated that he had fixed it and expected to leave his property to defendant. To some of defendant's witnesses, testator in recent years stated his children were all against him, that his boys took everything from him they could get and that plaintiff Mrs. Adams tried to steal his automobile, and she (his daughter) baked a cake for him, but that he would not eat it. The witness Walter Laws testified that testator said that all his family seemed to have it in for him, that William and Roy seemed to be the worst of the family against him. This witness said that Newton and Ollie always spoke well of the father, but that Roy and William used pretty rough language. The witness Whitaker testified to hearing plaintiff William Hauger call his father a ''crazy old fool.''

Defendant Nannie Kendrick, the principal beneficiary under the will, testified that she lived two miles east of Cameron and was next to the oldest child of testator, William being the oldest. She was married in 1889 at the home of her father and mother, and then she and her husband moved to a farm where they have since resided with the exception of one year, from March, 1921, to March, 1922. She testified that her father did not get word in time to go to her mother's funeral, but that he stated to her that he was sorry for it. She testified that she took no part in the family troubles between her father and mother, but heard of the troubles from both sides and knew that her father visited her mother after the separation. She only visited her father at the sawmill once, but often visited her mother. At the request of her brother Roy, she went to wait on her father when he had a sick spell, and stayed at his bedside some

weeks, returning home after his recovery. Prior to her moving to Kansas and after her return to Missouri, she visited her father, perhaps once a month, and often baked bread for him. During the fruit season, she went to his home and put up fruit for him. Testator once told her that he was going to fix everything and leave it to her, but did not tell in what way he was going to fix it; she heard him make a similar remark to the witness Thomas. She denied using or trying to use any influence over her father, and denied saying anything to him against her brothers and sisters.

Defendant introduced an affidavit made by testator and filed with the Pension Department, in which he states, among other things, the names of his children, mentioning the plaintiff William as one of them.

I. In the oral argument, as well as in their brief, counsel for defendant insist that error was committed by the trial court in permitting counsel for the plaintiffs to make certain statements in the presence and hearing of the jury.

(a) It is claimed that in the opening statement of counsel for plaintiffs, improper remarks and improper references were made, which seriously prejudiced defendant's case. It is not necessary to go into this matter for the reason that the defendant in her motion for a new trial did not assign such alleged misconduct as one of the errors, which, of course, prevents this court from now considering the same. Many times it has been said that if a party intends to rely in the higher court on alleged errors committed by the trial court, it is the duty of such party to properly call the trial court's attention to such error in the motion for new trial; and upon failure to do so, such alleged error is waived. [Grott v. Johnson, 2 S. W. (2d) l. c. 790; Huhn v. Ruprecht, 2 S. W. (2d) l. c. 760.]

(b) Defendant also complains that counsel for plaintiff was guilty of improper conduct, in various ways, during the progress of the trial which prejudiced her case before the jury. But as such alleged improper conduct is not assigned as one of the grounds for error in the motion for new trial, the same cannot now be considered. [Authorities supra.]

We must presume that the trial court saw the conduct of counsel and did not permit anything to be done that would prejudice defendant's case, and in the absence of an abuse of the discretion on the part of the trial court, the same is not ground for reversal. [Moll v. Pollack, 8 S. W. (2d) l. c. 48.]

(c)   Error was committed in the admission of evidence and in the giving of an instruction on behalf of plaintiffs, on the subject of insane delusions.   As heretofore stated, one of the grounds of the contest alleged in the amended petition was that the testator possessed an insane delusion, to-wit, that his son William was not his child, etc., and this is the only allegation regarding an insane delusion possessed by him.   Over the objections of defendant, the court permitted plaintiffs to prove that testator possessed not only the insane delusion alleged, but three other insane delusions, to-wit, that his daughter, Mrs. Kendrick, had been guilty of adultery with her uncle and that he (testator) had caught her with her uncle in her room and in her bed, that testator possessed the insane delusion that his sons were trying to steal all of his property, and that his daughter, Mrs. Adams (plaintiff), tried to steal his automobile.   It is fundamental that the petition must allege the cause of action upon which the plaintiffs ask judgment; and in a will contest, the plaintiff must state the one or more grounds upon which he contests the will.   In the instant case, plaintiffs alleged three grounds: (1) unsoundness of mind, (2) fraud and undue influence, on the part of defendant, and (3) an insane delusion that testator believed his son William was not his son, etc.   There is no allegation whatever regarding any other insane delusion; hence defendant had no notice that plaintiffs intended to rely upon proof of any other insane delusion.   When plaintiffs offered to prove by Mrs. Adams that testator possessed these other insane delusions, counsel for defendant objected for the reason that the same were not the insane delusions set forth in the petition; but their objections were overruled.   Then, on behalf of plaintiffs the trial court gave instructions numbered 5 and 6 on the subject of insane delusions. Plaintiff's Instruction 5 properly defined an insane delusion; but plaintiff's Instruction 6 was erroneous.   It submitted to the jury the issue of whether testator had an insane delusion on the subject of the paternity of his son or on the subject of hatred and enmity of his sons toward him.   As stated, the petition must set forth the plaintiff's cause of action, and the issues cannot be broadened or extended, either by the admission of evidence or instructions on behalf of plaintiff.   [Cole v. Armour, 154 Mo. l. c. 350-1.]

In a Missouri will contest, the plaintiff alleged that two of the defendants exerted undue influence over testator in the making of his will, and at the trial offered to prove that a third defendant exerted undue influence over testator.   This evidence was excluded by the trial court; and on appeal, this court said: "The undue influence is limited to James and Ben Hardin.   *Expressio unius est exclusio alterius.*   The misconduct of no other party or person could be expected to be inquired into under this limited averment.   The plain-

tiffs have thus restricted the field of inquiry. The defendants could not be required to come prepared to investigate the conduct of any other person." [Jackson v. Hardin, 83 Mo. l. c. 186.]

In another will contest, the grounds were stated in the petition to be unsoundness of mind and undue influence on behalf of the widow of testator, defendant in that case. At the trial, plaintiffs offered to prove that the widow admitted that testator did not sign the will, but that she did. This evidence this court held to be incompetent, using this language: "It is enough to say that the petition raised no such issue, and such testimony was therefore wholly inadmissible, and that no such contention is allowable." [Wood v. Carpenter, 166 Mo. l. c. 484; Rogers v. Troost, 51 Mo. l. c. 474.] See also In re Kile, 72 Cal. l. c. 132; Hairston v. Hairston, 30 Miss. l. c. 307; Barksdale v. Davis, 114 Ala. l. c. 629; Livingston's Appeal, 63 Conn. l. c. 74; Purdy v. Hall, 134 Ill. l. c. 305; Vickery v. Hobbs, 21 Tex. l. c. 575.] The Maine courts hold that an insane delusion must be pleaded. [Barnes v. Barnes, 66 Me. l. c. 298.]

It must be remembered that the petition does not ask to have the will set aside because of insane delusions, but it especially mentions one insane delusion. Under such circumstances, plaintiff should be limited to "the precise specification pleaded," as stated by LAMM, J., for this court. [Story v. Story, 188 Mo. l. c. 118-119; Degonia v. Railroad, 224 Mo. l. c. 589.]

II. It is fundamental that evidence in a suit over a will, as in all other actions, must be relevant to the issues; and that matters that throw no light whatever on the controversy should be excluded. Such evidence tends to becloud the issues and ofttimes prejudices the party before the jury. Every person is entitled to a fair trial, and evidence should not be introduced for the purpose of creating prejudice against either the plaintiff or defendant.

(a) Evidence was introduced by plaintiffs tending to show that defendant did not come to see her father as soon as she was notified of his serious illness, that she later on went to see him at the hospital in St. Joseph and objected to employing and paying a special nurse to wait on him. Evidence was also introduced tending to show that one of the plaintiffs, Mrs. Adams, insisted on his having a special nurse. We cannot see the relevancy of such evidence, as the will in question had been written three years and three months prior thereto; and the promptness with which defendant responded to the news of her father's illness and the objection, if any, that she made to employing an extra nurse at the hospital could throw no light whatever on the condition of his mind,

nor the alleged undue influence exerted by her. On the other hand, it had the effect of placing her in a bad light before the jury.

(b) Neither can we see the relevancy of the evidence of the witness Sloan, to the effect that he took an order for a monument and that he or testator misspelled testator's name, and that the name was misspelled on the monument, being spelled "Haguer." From the letters offered in evidence and conceded to have been written by testator, the conclusion is irresistible that he was an illiterate man. These letters are almost entirely free of punctuation, and the capitalization, spelling and grammar are bad. The fact that he or someone else made a mistake in spelling his name on the tombstone cannot be considered evidence of unsoundness of mind, certainly not of undue influence. Many persons who are well educated and of sound mind are not good spellers, and not good at detecting errors in spelling, and that would be especially true of a man the age of testator.

III. Error was also committed by the trial court in the giving of plaintiff's Instruction 2, which is in conflict with defendant's Instruction 7. Each instruction attempted to explain to the jury the meaning of a "sound mind," but plaintiff's instruction does not properly define that term. Without quoting both instructions in full, owing to the necessary length of this opinion, we will simply refer to the case of Hartman v. Hartman, 314 Mo. 305, 313, 284 S. W. l. c. 489, where an instruction similar to plaintiff's was condemned.

IV. It is insisted by counsel for defendant that error was committed by the trial court in submitting to the jury the question of the soundness of testator's mind, counsel taking the position that there was no evidence whatever justifying such submission. It is not the duty of this court to pass on the weight of the testimony, not even in a will contest, unless the verdict is so grossly against the weight of the evidence as to satisfy the court that it was the result of passion and prejudice on the part of the jury. [Buford v. Gruber, 223 Mo. l. c. 252.] It is not necessary here to again detail the story of the life of testator, nor to enumerate the various differences that he had with his wife, with the plaintiffs and with others. It should be borne in mind, however, that the fact that he did have lawsuits with his wife and lawsuits with his children was no proof of unsoundness of mind, especially as he was successful to some extent in such litigation. The fact that testator shot at a man twenty years before his death and had a lawsuit with his partner and others cannot be con-

sidered as evidence of unsoundness of mind. Many persons have litigation and some really seem to live and thrive thereon, apparently enjoying it. The courts of the country are open to any man who thinks he has been aggrieved, and the courts are open to any person who thinks another has brought an unjust accusation against him. The fact that some of these lawsuits were bitterly contested and some of them were compromised does not affect the case. It is unusual and shocking to think of a man accusing his wife of stealing things out of the house and prosecuting his wife and three sons for stealing apples, yet it must be remembered that the feeling between testator and his wife was so bitter as to cause a separation, a divorce suit and suits regarding his property; and the feeling between him and his sons was so bitter as to cause him to bring suit against some of them, making serious charges which, of course, increased the bitterness. The fact that the wife and sons had taken apples from trees growing on testator's ground and had even broken down the fence around that ground would not be sufficient to justify many husbands or fathers in instituting such a prosecution, yet it must be remembered that testator and his family, as shown by the evidence, did not have that affection for each other which they should have had. While not attempting to justify the rough and profane language used by testator toward his wife and children, the evidence shows that all the rough language was not used by testator; neither was the repetition of family scandal confined alone to him. At least one other member of testator's family seemed to enjoy rolling a bit of scandal as a sweet morsel under her tongue. From the evidence before us, we are justified in saying that testator was a man of high temper, ugly disposition and given to the roughest and commonest kind of expressions. Yet, we know that many persons use profane language and rough expressions even in talking about those who are near and dear to them. We cannot say that because a man brings suit against his wife and says ugly things regarding her and ugly things regarding his children, such conduct and such language establish the fact, as a matter of law, that he is of unsound mind.

But the mistreatment by testator of his family and the use of the profane and indecent language regarding them were circumstances, in connection with other circumstances, to be considered in determining the soundness of his mind. The fact that testator suffered two injuries to his head during the Civil War, that while operating a threshing machine many years later in the midst of summer heat he had a sunstroke, that he fell through a bridge with his threshing outfit and received wounds on his head, that he stated that his injuries had effected his mind, and the fact that his mother and two sisters became and died insane, when considered in connection with his age, his physical ailments, his unnatural feelings toward some of

his children, his failure and refusal to eat for days at a time, his crying without any cause, his continual brooding over imaginary troubles and his method of living in dirt and filth at the time the will was executed, when coupled with the disinheritance of five of his children, justified the court in submitting that issue to the jury. It is true that defendant offered a number of witnesses, business men and farmers, who knew testator for several years prior to his death and prior to the execution of the will, who testified that he was of sound mind, many more witnesses than were produced by plaintiffs; but the weight to be given to the testimony of the witnesses was a matter for the consideration of the jury. Hence, we hold that the court committed no error in submitting this issue to the jury.

In connection with the question of the soundness of mind of testator, it is proper to say that there was sufficient evidence to justify the submission to the jury of the question of insane delusions, had such insane delusions been properly pleaded. A number of witnesses testified to these delusions, and at the very time testator gave instructions to Mr. Livingston for the preparation of the will, he said that he wanted to give all his property to defendant Nannie Kendrick, as "all the children seemed to be against him, except Mrs. Kendrick." The will gives all of his property to defendant except one dollar to each plaintiff. From the number of persons testator talked to regarding the paternity of William and regarding his unkind and unjust treatment by the other children, extending as his conversations did over many years and up to the very time he gave instructions for the writing of this will, it will be seen that there was substantial evidence from which the jury could find that this will was the result of insane delusions.

V. Was there evidence to sustain the allegation that testator at the time of the execution of the will was unduly influenced by defendant, or that any fraud was perpetrated upon him by defendant to induce the execution of will? It is true, as stated by counsel, that fraud and undue influence can rarely if ever be proved by direct evidence, but the same may be inferred from facts and circumstances. [Roberts v. Bartlett, 190 Mo. l. c. 700.] It is also true that fraud and undue influence cannot be presumed, but that the party asserting the same must produce substantial evidence in support of such assertion.

We cannot concur in the position of plaintiffs' counsel that the visits made by defendant to her father once every three or four weeks during the time he was attempting to keep house by himself tends to prove undue influence; neither does the fact that defendant baked bread and took it to the old man, nor that she put up fruit for him in season. Acts of kindness are rather to be commended

than to be condemned. What could be more natural than for a man's daughter to render to him acts of kindness during his declining years? If such acts are to be denounced as improper, the old and afflicted would unnecessarily suffer. We have read and re-read this voluminous record carefully and find no evidence of undue influence. There being no allegation and no proof of confidential relations, the burden was on plaintiffs to prove that defendant exercised undue influence, so often described by opinions of this court, and so well defined by an instruction in this case.

The testimony of Mr. and Mrs. Hamlet regarding the excitable condition of testator after the visit of defendant and the profane language that he then used regarding his sons is very indefinite. It does not appear whether such visits occurred and such language was used before or after the execution of the will. True, Mr. Hamlet testified "she [defendant] said the boys was planning to steal all they could from him;" yet he further admitted that he was not present when that was said, but was in another room; and that he was so hard of hearing that he had difficulty on the witness stand hearing the questions of counsel. Certainly such testimony does not measure up to the standard that is required by our courts to establish undue influence.

Several witnesses testified for plaintiffs, notably Mr. and Mrs. Hamlet and U. L. Buck, regarding statements made by testator to the effect that defendant said her brothers were trying to steal all of his property, etc. Counsel for plaintiffs seem to consider these statements of testator as proof of fraud and undue influence on the part of defendant. In this, learned counsel are in error. In a well considered opinion, LAMM, J., in behalf of this court, said: "If, therefore, we concede the admissions of the testatrix were to the effect stated, viz., that she was constrained by her other daughters to disinherit Bridget, and that they were exerting an undue influence upon her to that end, yet those statements are not to be taken as true for the purpose of establishing the undue influence and defeating the will." [Teckenbrock v. McLaughlin, 209 Mo. l. c. 550; Hayes v. Hayes, 242 Mo. l. c. 170-1; Gordon v. Burris, 141 Mo. l. c. 613.]

The amended petition alleged that fraud, coercion, and undue influence were practiced by defendant Nannie Kendrick and her husband John Kendrick and others acting in their behalf. There was no evidence of any other person exerting influence over testator who acted in behalf of defendant; and only three times in this record is the name of her husband mentioned. One of plaintiffs testified that defendant married John Kendrick against her father's wishes, and defendant testified that her marriage to John Kendrick was with her father's consent, and defendant testified that she and her husband lived in Kansas for one year, the same being a part of the time

when it is claimed she exercised such influence over testator. Although there was no evidence that John Kendrick, or anyone else, exerted any influence in behalf of defendant over testator, yet plaintiffs' Instruction 4, which was given by the court, submitted to the jury the question of whether defendant Nannie Kendrick or my other person or persons in her behalf, by persuasion, suggestion, importunity or other device or machination coerced the will or confused the mind of testator, etc. The giving of an instruction where there is no evidence upon which to base it constitutes reversible error. [Rawlings v. Railroad, 175 S. W. (Mo.) l. c. 940; Scheurer v. Rubber Co., 227 Mo. l. c. 357-8.]

For the errors herein mentioned, this cause is reversed and remanded for a new trial. All concur, except *Ragland, J.*, not sitting.