**Lucy McGRAIL, Plaintiff-Respondent,**

**v.**

**Sadie T. RHOADES and Margaret Wallow, Defendants-Appellants.**

No. 46972.

Supreme Court of Missouri,

Division No. 2.

May 11, 1959.

George H. Jones, Kansas City, for appellants, Clarence C. Chilcott, Kansas City, of counsel.

R. B. Kirwan, Kansas City, for respondent.

BARRETT, Commissioner.

In articles one, four and five of his will James Robert ("Bob") McGrail provided for the payment of any debts and funeral expenses and for alternate executors; by article two he bequeathed to his daughter, Lucy McGrail, "$500.00 in cash," and in article three he bequeathed the residue of his estate to his two surviving sisters, Margaret Wallow and Sadie T. Rhoades. Upon Bob's death and the probate of his will his daughter, Lucy, instituted this action against the sisters, Mrs. Rhoades and Mrs. Wallow, to contest the will, alleging undue influence on the part of the sisters and mental incapacity by reason of alcoholism and an insane delusion that the plaintiff was not his child. By a nine to three verdict a jury found that the instrument was not the will of Bob McGrail and the sisters, after an unsuccessful motion for a new trial, have appealed from the judgment entered upon the verdict.

. [1, 2] In their brief the appellants have technically complied with Rule 1.08(a) (1), 42 V.A.M.S.: "The brief for appellant shall contain: (1) A concise statement of the grounds on which the jurisdiction of the review court is invoked; * * *." In technical compliance they have said that the amount involved upon the appeal exceeds $7,500 but the statement is a meager conclusion and there are no references to the record where the fact is affirmatively demonstrated and it is therefore necessary that the court examine the record and affirmatively determine that "the amount in dispute * * * exceeds the sum of seventy-five hundred dollars" (Const.Mo., Art. V, Sec. 3, V.A.M.S.) and thus establish jurisdiction of the appeal in this court. Blake v. Shower, 356 Mo. 618, 620, 202

S.W.2d 895, 896. Bob's inventoried estate consists of two items, "oil leases owned in the Alfred Clay A and Clay B leases, Rusk County, Texas, $33,732.00 and one man's diamond ring, $100.00," total value $33,832. A probate court deputy clerk identified the inventory but it was not established whether any claims had been allowed against Bob's estate. The deputy clerk did say that there had been several settlements. The trial court sustained an objection to the question whether the clerk's file showed "any allowances made to the attorneys here." The will consists of "bequests" only, and if the appellant sisters prevail the property will be divided between them, if the respondent daughter prevails the property descends according to the law of descent and distribution and she, of course, would inherit the entire estate. V.A.M.S., Sec. 474.010. Several times in cross-examining the sisters the value of Bob's estate was established as over $30,000 at the time of the trial and it was tacitly assumed by the parties throughout the trial that the victor in the litigation would receive that sum, and thus it affirmatively if inferentially appears that the "amount in dispute" exceeds $7,500, thereby vesting this court with jurisdiction of the appeal. Aaron v. Degnan, Mo., 272 S.W.2d 216, 217; Odom v. Langston, 351 Mo. 609, 613–614, 173 S.W.2d 826, 829.

Bob was almost seventy-one when he died on October 31, 1955, but it is not known how old he was when he and Mrs. McGrail were married. They were married in Kansas City on April 17, 1915, and the plaintiff, Lucy, was born January 14, 1916. Nine years after their marriage, in 1924, Mrs. McGrail instituted a suit for divorce; the grounds for divorce are not made to appear but she did allege in her petition that Lucy, then eight years old, was born of the marriage, and upon Bob's default she was granted a divorce, custody of Lucy and six dollars a week child support. Sometimes Mrs. McGrail sent Lucy to Bob's place of employment to collect the six dollars but finally, according to her, the

money was paid into or collected through "the welfare department." Throughout the years Lucy and her mother have lived together and worked, and Lucy was forty-two years old and single when the case was tried. It is not known where Bob lived immediately following the divorce but in 1927, 1928 and 1929 he lived in his sister's (Mrs. Rhoades') home. He was then working part time in yards and nurseries, "just odd jobs." The dates and precise circumstances were not known to the sisters but Bob was married a second time and divorced. In those days Lucy remembered seeing her father about once a week from March to July 1929. . She said that he was cordial but did not invite her to dinner or lunch, "just gave me the money (the six dollars) and just a brief conversation and that was about it." Also in June 1929 "when she graduated," apparently from grade school, she asked her father for "a graduation outfit." He agreed to buy "the outfit" as a graduation present and told her that he had a charge account at Spalding's and for her to buy it there. She bought a "pink silk dress, that had pleats in front" and hose, but when she again saw her father after he had received the bill and it was "around 20 or 25 dollars" he complained that the charge was exorbitant and said he wouldn't pay anything else for her and "he never did." Lucy did say that she saw her father in court in 1932 when her mother was trying to collect child support and again, "around Easter time in 1933." Lucy had a boy friend who was curious about her father and she took the boy to her father's place of employment and she says that he did not recognize her. As Lucy and her boy friend were about to leave she said, "By the way, Dad, I'd like for you to meet my boy friend, Joe Friedman," but Bob just shook hands with the boy and turned and walked away.

In the latter part of 1929 or sometime in 1930 Bob, at least as far as his relatives, his former wife or Lucy were concerned, all but vanished and, except for the noted brief encounters by Lucy, none of them saw or heard of him again or knew what he was doing for the next fifteen years. Mrs. McGrail said that she once heard "he was baby-sitting some" and mowing lawns. One of the sisters knew where he went "one time"—to "Mr. Wilson's, somewhere out the other side of Olathe, Kansas." And a brother-in-law saw him on the streets sometimes but there were no contacts and they did not know where he lived. There "were years" when the sisters did not know where he lived, one sister said she did not see him for seven years, and it does not appear during the fifteen years that either his sisters, his former wife or his daughter were particularly concerned or manifested any interest in his whereabouts and he did not communicate with any of them—one sister wrote to him but the letters came back. But in 1946 Bob and his sisters, Mrs. Rhoades and Mrs. Wallow, came into equal inheritances of oil interests from their deceased sister in Texas and thenceforward there has been manifest interest in Bob and his whereabouts. Finally, in response to "a personal" in the Kansas City papers Bob called his sisters on the telephone and was informed of his good fortune.

After Bob's reappearance, in 1947, 1948 and 1949, he lived in the home of his sister, Mrs. Wallow, but even in those years it does not appear that his former wife or his daughter saw him or knew where he lived although they too heard of his inheritance. The first time Lucy saw him after his reappearance was in 1950 and Mrs. McGrail first saw him "was about '52 or '53, about '53," two years before he died. The latter part of 1949 or in 1950 Bob left his sister's home and moved into one of the choice rooms in the Andrew Jackson Hotel on 12th Street and there he resided until he was killed by a "hit-and-run" driver as he crossed 12th Street on Halloween night, 1955. During the years he lived at the hotel he continued his friendly social relations with his sisters, often spending weekends from Friday to Monday in Mrs. Wallow's home. Occasionally the Wallows and the Rhoades were his dinner guests downtown in vari-

ous hotel dining rooms and restaurants and sometimes one of his brothers-in-law met him on the street and they would have a drink together in a tavern. On some of these occasions, his sisters say, Bob mentioned his daughter, Lucy, he particularly remembered cute things she said and did as a baby, and he once remarked that she "looks like the McGrails." According to the sisters he never questioned Lucy's paternity and neither did they question the fact that she was his child.

According to the proponents' witnesses, after moving into the hotel, Bob's habits and conduct were fairly normal and quiet for a single man living on an income of five to eight hundred dollars a month. He was always neat and clean, liked good clothes and was always well dressed with a penchant, however, for gaudy ties, sequin-covered vests and sometimes he wore fancy cowboy boots, handed down from a deceased brother-in-law, and sometimes he wore a yellow cowboy hat. He was friendly and congenial and often had special food prepared at Wolferman's and delighted in serving it to his friends in the taverns on 12th Street. He was a prize-fight and baseball fan and liked to bet "a dollar" on a particular fighter or team. But according to these people, tavern operators and their regular patrons and the long-time manager of the hotel, Bob's memory was very good and while he often had several drinks he was always able to "take care of himself" and was never drunk, never in ill health and was indeed of sound mind when he executed his will August 27, 1953, more than two years prior to his death.

But, according to the witnesses for the contestant, after moving into the Andrew Jackson Hotel, Bob became "a character" well known to the habitués of the taverns and the regular inhabitants of 12th Street. His favorite haunts were Little Joe's, Lil's and other taverns on the street. It was his custom to drop in one of these places around eleven in the morning and have a drink, he might return in an hour or two to the same tavern or go to another for a couple of drinks and by four o'clock might settle down in a tavern for four or five drinks. Mrs. Wedge, Lucy's aunt and Mrs. McGrail's sister, worked for the assessor and had been a matron in the sheriff's office and, working out of the courthouse, frequently saw Bob on 12th Street, going in or coming out of taverns. She said that he did not recognize her although she once stopped him on the street and asked him to help Lucy, meaning financially of course. She described a black velvet shirt with sequins he was wearing, his cowboy hat, his drinking—drunk, as a rule, she said, and gave it as her opinion that "his mental condition was not good." John Shine, another courthouse attache, frequently dropped into Little Joe's for a drink and there he usually saw Bob drinking. He said that Bob dressed to attract attention, wore vests with sequins, rambled in his talk about race horses and sometimes "let out a loud scream"—cowboy fashion. He somehow knew that when Bob was killed by the hit-and-run driver on Halloween night that he was carrying a candied apple and claimed that he had gotten it "trick and treat." Shine was of the opinion that Bob was "whiskey silly" and "mentally unbalanced." Another courthouse attache from the sheriff's office, whose wife and Lucy are "first cousins," saw Bob coming in and out of the taverns on 12th Street and, after learning of Bob's "windfall of money," asked him three or four times "why he didn't help" Lucy. A former tavern owner, now also attached to the assessor's office, knew Bob as a patron of his 13th Street tavern, and he frequently saw Bob drunk "on 12th Street." He said that Bob often wore a red tie, a yellow shirt, a green hat and sometimes cowboy boots and hat. In one tavern a certain bartender was a particular friend of Bob's and when Bob entered the saloon the bartender would "let out" with a cowboy yell and Bob would respond with a like yell. This witness did not testify to Bob's soundness of mind, although he did say that "he would generally be sitting there drinking a beer and eating a bowl of stew, he would call you up (from one

end of the bar to the other) and start conversation and go off into another conversation and I would walk away." Another witness, a lawyer, professed deep and abiding friendship for Bob; he said, "I loved Bob. He was my good friend." The lawyer and Bob were frequent companions in Little Joe's, Lil's Bar, the Brown Derby, and other saloons, "had many drinks with him." However, he says, Bob would put on a woman's apron, hat or pants and walk up to Wolferman's and buy sandwiches, spend a $100 on a tavern party, and it was his opinion, and he considered himself an expert by reason of his thirty-five years' experience as a lawyer, that Bob was of "unsound mind."

Mrs. McGrail said that Bob drank to excess during the time they were married and before the divorce, she said he was intoxicated every day. She said that he did not contribute to Lucy's support except as he was forced to do so and upon objection to some of her testimony by reason of its remoteness Lucy's counsel repeatedly said, "We will hook it up, Judge." She said that both before and after the divorce Bob never presented Lucy with "any gifts or anything." She too said that Bob often wore a purple hat, orange coat, green trousers, spangled vests and cowboy boots and hats. It was her opinion, after talking to him one time in 1952 or 1953 for ten minutes in a chance encounter as he came out of a tavern, that he was not "capable of anything."

All of this testimony has been set forth as indicative of the atmosphere in which the case was tried and as background for the issue upon which the case was in fact submitted to the jury, that the will was the result of Bob's insane delusion that Lucy was not his daughter. It is objected that the trial court erroneously permitted lay witnesses, there was no medical evidence as to either his sound or unsound mind, to express their opinions that Bob was of unsound mind without first detailing the facts upon which the opinions were based. It is also urged that the appellants are entitled to a new trial because the court erroneously permitted witnesses to testify to remote, unrelated prejudicial matters, all irrelevant to the basic issue involved in this case. But it is not necessary to consider these objections in detail; it is sufficient to note in passing that lay witnesses must have had an opportunity to observe the conduct and actions of a testator and they must first state the facts before expressing their lay opinions that he was of unsound mind at the time he executed his will. Furthermore, as has been repeatedly stated, eccentricities in dress and oddities of habit are of but slight if any factual foundation for a lay opinion of unsoundness of mind amounting to testamentary incapacity. Lee v. Ullery, 346 Mo. 236, 140 S.W.2d 5. The proof as to Bob's failure to support Lucy took a wide range from her infancy and childhood to two or three years before his death when there were repeated requests by her relatives "to help Lucy" when she was almost forty years old and had been supporting herself for many years. 67 C.J.S. Parent and Child, § 17, p. 704; 39 Am.Jur., Sec. 69, p. 710. Bob's drinking habits may have been a relevant circumstance (but see 94 C.J.S. Wills, § 25, p. 720, § 34, p. 739) but the proof in this case is not of delusion manifestly resulting from or connected with chronic alcoholism as was compellingly demonstrated in Buford v. Gruber, 223 Mo. 231, 122 S.W. 717, and Bensberg v. Washington University, 251 Mo. 641, 158 S.W. 330. But, as indicated, it is neither necessary nor desirable to consider whether there was substantial evidence of general testamentary incapacity or insanity by reason of alcoholism, the contestant daughter did not in point of fact submit these issues as grounds for setting aside Bob's will. There was a conventional abstract instruction defining testamentary capacity, but neither general testamentary incapacity nor alcoholism were hypothesized as grounds for setting aside the will and undue influence was specifically withdrawn from the jury's consideration. But again, with a record and a

case in this posture, it is not necessary to consider the relevancy or probative force and effect of any evidence introduced and supposedly bearing on the subjects of general testamentary incapacity and alcoholism or delusions induced by alcoholism. And it is not necessary to indicate what evidence is relevant and admissible or what instructions are proper or improper when these issues are not in point of fact involved and relied upon as constituting general testamentary incapacity. But see Adams v. Kendrick, 321 Mo. 310, 11 S.W.2d 16; Hall v. Mercantile Trust Co., 332 Mo. 802, 59 S.W.2d 664. It may be confidently asserted, however, "Where general insanity is not shown, but only some specific insane delusion or monomania, the will is valid unless the terms of it appear to have been directly influenced by the infirmity. The mental error must have been actually operative in the production of the instrument." Annotation 175 A.L.R. 882, 956.

The will involved here was to be set aside only if the jury should find that "it is invalid because James Robert McGrail was suffering from an insane delusion as defined in other instructions, that Lucy McGrail, the plaintiff, was not his child, which insane delusion overcame and controlled his will at the time of the execution of the WILL * * *." "Insane delusion" was defined as "A fixed and settled belief in something that in fact had no existence, which no rational mind would believe." There was also an instruction informing the jury that they could not set the will aside merely because of any ill and unfriendly feeling between Bob and Lucy. Thus upon this record the sole issue is whether there is any substantial evidence that Bob's will resulted from the insane delusion that Lucy was not his daughter. Stevens v. Meadows, 340 Mo. 252, 100 S.W. 2d 281; Clark v. Commerce Trust Co., 333 Mo. 243, 62 S.W.2d 874.

 In general in will contests the essential issue, the essence of the action, is the mental capacity of the testator, and

elaborate formulas and rules have been developed for measuring and testing a testator's general testamentary capacity and the rules and effect of insane delusion have been superimposed upon the general rules and formulas. The doctrine is in necessary recognition of the fact that notwithstanding full mental capacity in general and in all other respects a testator may lack mental capacity to execute a will by reason of an insane delusion or monomania. See the most authoritative and comprehensive annotation 175 A.L.R. 882, 885–886. Legal definitions of "monomania" and "insane delusion" are not so much authoritative definitions, they are rather statements or definitions of the evidence necessary to prove the malady (175 A.L.R. loc. cit. 886); nevertheless, an insane delusion or monomania is insanity; it is partial insanity with respect to a particular subject. 1 Page, Wills, Secs. 140, p. 289, 142, p. 292; Webster's New International Dictionary; Rose v. Rose, Mo., 249 S.W. 605. But, the mental error must have actually been operative in the production of the instrument, in the testamentary act, and although there was a delusion if the testator was in fact motivated by other rational reasons his will may not be set aside because of monomania. Lareau v. Lareau, Mo., 208 S.W. 241; Benoist v. Murrin, 58 Mo. 307, 323–324; Hall v. Mercantile Trust Co., supra. In this connection, it is often the obvious purpose of a will to disinherit children or other relatives, even unjustly, or "according to the loves, hates, or caprices" of the testator (Williams v. Lack, 328 Mo. 32, 42, 40 S.W.2d 670, 675; Huffnagle v. Pauley, Mo., 219 S.W. 373), and yet the law regards the expectations of children and relatives as something a competent testator will have in mind. Annotation 175 A.L.R. loc. cit. 891.

 As previously stated Bob and Mrs. McGrail were married on April 17, 1915, Lucy was born January 14, 1916, and Mrs. McGrail was granted a divorce and custody of Lucy and a judgment for her support March 13, 1925, upon the uncontested allegation that Lucy was born of their mar-

riage. In these circumstances, supported by the uncontradicted testimony of Mrs. McGrail that Lucy was Bob's daughter and that there was no possible reason for his questioning her faithfulness during their marriage, there were no rumors, facts or circumstances upon which he could reason and come to the mistaken conclusion that Lucy was not his child or that there was any basis for his delusion. Compare: Ahmann v. Elmore, Mo., 211 S.W.2d 480, and Conner v. Skaggs, 213 Mo. 334, 111 S.W. 1132. On the other hand, unless the will is construed as a disinheritance of Lucy, there is nothing in the will itself indicating that in executing his will the delusion that Lucy was not his daughter was operative in the testamentary act. On the contrary, Bob's will said, "I give, devise, and bequeath *to my daughter, Lucy McGrail,* of Kansas City, Missouri, the sum of Five Hundred Dollars ($500.00) cash." Sometimes the will itself may circumstantially support the inference that the delusion is operative in the testamentary act; for example, in Everly v. Everly, 297 Mo. 196, 249 S.W. 88, the second clause of the will said, "I give, devise and bequeath to James Earl Everly, *a son of my first wife reputed to be my son,* the sum of five (5.00) dollars only." Or, in Knapp v. St. Louis Trust Company, 199 Mo. 640, 98 S.W. 70, 71, the mental error and delusion was that the testatrix had previously given her daughter $20,000, and the will recited the fact: "I have already given to my daughter, Anna, personal and real estate to the amount of twenty thousand dollars ($20,000), and I make no further provision for her, * * *." Thus in this case there was no reasonable basis upon which Bob could come to entertain the erroneous belief that Lucy was not his daughter. On the other hand, there is nothing in the will itself to indicate that any such delusion was operative in the testamentary act. The fact of the five hundred dollar legacy to Lucy may be some evidence of a harsh or even unnatural disposition (Hardy v. Barbour, Mo., 304 S.W. 2d 21, 36), but an unnatural or harsh provi-

sion in a will is of force only when there is other evidence of testamentary incapacity. Wade v. Kirksville College of Osteopathy & Surgery, Mo., 270 S.W.2d 811, 814; Kaechelen v. Barringer, Mo., 19 S.W.2d 1033.

In its essence the following is the evidence relied upon as establishing and requiring the submission of Bob's partial insanity and monomania that Lucy was not his daughter and that the insane delusion entered into his testamentary act and invalidated his will: Mrs McGrail testified to the marriage, Lucy's birth and the divorce, and then she was asked, "Now, before that, what was his reaction, if any, towards Lucy?" Mrs. McGrail replied, "He said that she wasn't his child, that she didn't look like him and she wasn't his child." Then again, in "'52 or '53, about '53," Mrs. McGrail came out of a parking lot and met Bob on the street, intoxicated, and engaged him in a ten-minute conversation in which she asked him "if he wouldn't help" Lucy but he replied that "He never intended to do anything for her. * * * Because she wasn't his child. * * he didn't seem to know me until I told him who I was, you know, said he didn't have a daughter, didn't remember a daughter." Mary Wedge, Mrs. McGrail's sister and Lucy's aunt, encountered Bob on 12th Street, probably in 1955, and asked him "if he wouldn't help Lucy." But Bob's reaction to her request was, "He would always say that Lucy didn't belong to him, that he would never do anything for her. * * * He said his sister said that Lucy didn't belong to him." Another of Lucy's relatives, the one who heard of Bob's "windfall of money," talked to him on 12th Street three or four times, dates not specified, and he said, "I asked him why he didn't help Lucy, they were in dire straits and needed money, that Lucy's mother had been ill, et cetera, and he stated that Lucy was not his daughter and for that reason, he didn't see why he should help her." Lucy testified at length concerning her life

and her encounters or lack of encounters and knowledge of her father, and she knew of but a single occasion on which he denied that he was her father. She said that she was with her aunt in June 1953 when her aunt saw Bob approaching from the direction of the Andrew Jackson Hotel and asked if she did not want to say "hello" to her father. The aunt said, "Bob, don't you want to speak to your daughter, Lucy?" But, "He denied that he was my father, in front of me, and my aunt was so mad at the time * * *." And finally, there was his lawyer friend and drinking companion; he said that when Bob "got pretty drunk" he would say, "I have a daughter some place, but she is not my daughter. My sisters tell me she is not my daughter. * * * That she looked like him, but his sister said she was not his daughter." Or, the lawyer said, Bob would "start crying" and say, "I have a daughter some place, but she is not my daughter. My sister told me that. I want to give her everything, but my sister says she is not my daughter."

The problem and the question is whether these attributed statements alone, on one occasion before his divorce and on the occasion of these casual encounters on 12th Street or in its taverns, constitute substantial evidence of Bob's insanity with respect to this one subject. Against these statements are these established, incontrovertible facts and circumstances: For the period of more than nine years, from their marriage in 1915 to the divorce in 1925, Bob lived with Mrs. McGrail and Lucy, as the husband of one and the father of the other, and except for the one statement attributed to him by Mrs. McGrail there was more than tacit recognition of Lucy as his daughter. There was tacit recognition of the relationship when Lucy asked for and Bob bought the graduation present, and, of course, there is explicit recognition in his will. Then there were thirteen years or more in which no one saw Bob and during that period of time there is no evidence as to his conduct or that he denied

Lucy. And finally, of course, Bob is dead and we are not specifically informed as to his reasons for leaving the bulk of his estate to his sisters, with whom he was on the friendliest of terms during the last nine years of his life and earlier, rather than to his daughter with whom he had, at most, one or two chance encounters in thirty years or more.

■ Not only is monomania or insane delusion partial insanity, superimposed upon the general rules with respect to testamentary incapacity, in the cases establishing the fact "something more than the delusion itself is shown. In some, the evidence is of irrational acts or expressions, in others it is of other and unrelated delusions. In other words, the aberration in question is shown against a background of abnormality, so that even if independently it could not be found to have been an insane delusion or monomania, it may be found to be such upon the total evidence at hand." In other words, to prove belief of a fact to be an insane delusion, it is necessary to supplement and corroborate the testator's mere erroneous expression of belief with other evidence indicative of an unsound mind. Annotation, 175 A.L. R., loc. cit. 901, 927. For example, in Hardy v. Barbour, supra, there were multiple delusions manifested in a most purposeful and persistent manner over a period of years, there were repeated false accusations and recrimination all pointing to unmistakable, unnatural hatred of a daughter. In Adams v. Kendrick, supra, the testator's delusion that he was not the father of a certain child was corroborated by proof of threats to kill his wife and family, false accusations that his wife was unfaithful, beating his wife and uncontrollable rages. In Buford v. Gruber, supra, the testator suffered from the delusion that one of his three children in nine years of marriage was not his daughter. But in that case there was not only proof of the delusion, there was also proof of sodden, debauched drunkenness and delirium, and his conduct

over a period of years manifested the over-powering madness of his delusion. In Evans v. Partlow, 322 Mo. 11, 16 S.W.2d 212, 216, the testator's delusion that Hubert was not his son was manifested by bitterness and repeated brutal beatings and inhuman treatment of the son over a period of years; there was fanaticism if not madness on other subjects, from all of which it could reasonably be inferred "that the will in which he disinherited his son was made under the influence of this strange delusion and unnatural hatred of his son."

Here there was thirty years' estrangement between father and daughter, but there is no cogent, compelling evidence supplementing Bob's mere statement that Lucy was not his daughter. There is no corroborative evidence of intense hatred, brutality or aversion, or even of bitterness. The essence of this case is whether in the circumstances detailed by Lucy and her witnesses Bob's mere repeated statement that Lucy was not his daughter is alone sufficient evidence from which a jury could reasonably draw the inference and conclusion that he was insane with respect to this one subject and therefore lacked the requisite capacity to make and execute his will. It is our view that this uncorroborated circumstance, standing alone, is not of sufficiently compelling force to permit the inference and finding. Zorn v. Zorn, Mo., 64 S.W.2d 626; Gaume v. Gaume, 340 Mo. 758, 102 S.W.2d 636; Annotation, 175 A.L.R. loc. cit. 901, 927; Potter v. Jones, 20 Or. 239, 25 P. 769, 12 L.R.A. 161; Miller v. Weston, 67 Colo. 534, 537, 189 P. 610, 611. Accordingly, the judgment is reversed and the cause remanded.

BOHLING and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by BARRETT, C., is adopted as the opinion of the Court.

All concur.