**E. E. BACH MILLWORK COMPANY, Plaintiff-Appellant,**

v.

**MEISNER AND COMPANY, Defendant-Appellee.**

No. 9070.

Supreme Court of North Dakota.

April 24, 1975.

William R. Mills, Bismarck, for plaintiff-appellant.

Pearce, Anderson, Pearce, Thames & Pearce, Bismarck, for defendant-appellee, argued by Harold L. Anderson, Bismarck.

SAND, Judge.

This is an appeal from a judgment of dismissal granted pursuant to Rule 41(b), North Dakota Rules of Civil Procedure, and entered against the plaintiff-appellant E. E. Bach Millwork Company for the reasons that appellant was not a real party in interest as contemplated by subsections (a) and (c) of Rule 17, N.D.R.Civ.P.; that appellant had failed in its proofs on a motion for substitution under Rule 25(c), N.D.R.Civ.P.; and, that the appellant, having failed to comply with Section 10–22–19, North Dakota Century Code, lacked the capacity to maintain its action in the courts of this State.

In 1966, or early 1967, the appellee, Meisner and Company [hereinafter Meisner], a North Dakota contractor, contracted with Mary College, Bismarck, North Dakota, to

construct a building at the college. On May 12, 1967, Meisner entered into a written contract with E. E. Bach Millwork Company [hereinafter Bach], Mendota Heights, Minnesota, for materials for the college building. The contract provided that the work contracted for by Bach was to be done at Bach's direction by Northwestern Sash and Door Company, Fergus Falls, Minnesota. Meisner agreed to pay Bach the sum of $59,566.00 pursuant to the contract.

It appears that subsequent to entering into this contract Bach began having financial problems which put in jeopardy its performance, and the parties to the contract agreed that Meisner would pay for gross deliveries of worked materials as they arrived at the Mary College site. Pursuant to this agreement Meisner made at least two payments to Bach under the contract for delivered materials.

In October 1968, Bach filed a complaint in Burleigh County district court against Meisner alleging that it (Bach) had furnished all materials pursuant to the contract as of July 1968; that the amount remaining due from Meisner was $22,775.44; and that Meisner refused to pay the amount owing.[1] Meisner's answer admitted that materials provided for under the contract had been furnished, but asserted in its counterclaim that Bach's delay in furnishing those materials entitled Meisner to invoke a calendar-day liquidated damages clause in the contract and that the invocation of this clause meant that Bach owed Meisner $769.18.[2]

Subsequent to the filing of its complaint, Bach received an additional payment, which reduced the amount it sought under the contract to $17,123.04, and increased the amount said to be owing by Bach to Meisner under Meisner's amended answer to $5,769.18.

In 1969 and in 1972 both parties sought summary judgment on the merits. These motions were denied and no further action was taken on the case by the plaintiff Bach, with the exception of the filing of a trial brief in September 1973.

In September 1973, the defendant Meisner served its second amended answer alleging that Bach was not the real party in interest. The basis for this defense was predicated upon the fact that Meisner had received notices of assignment of their account with Bach from James Talcott, Inc. and from Weyerhauser Company.

In May 1974, Meisner served its third amended answer alleging further that Bach was a dissolved corporation and thus without legal capacity to sue for that reason as well as the reason that Bach had not received a certificate to transact business in North Dakota pursuant to Section 10–22–19, N.D.C.C. At the same time, Meisner moved to dismiss Bach's action on the bases raised as defenses in its second and third amended complaints.

In support of its motion, Meisner filed with the trial court a document received from the Minnesota Secretary of State showing that E. E. Bach Millwork Company had been voluntarily dissolved as a Minnesota corporation in 1961; a document from the North Dakota Secretary of State showing that Bach, Northwestern Sash and Door Company, Fergus Falls, Minnesota, and Modern Door and Lumber Company had never registered to do business in this State pursuant to Section 10–22–19, N.D.C.C.;

---

1. Bach also alleged that Meisner, as general contractor, took payments from Mary College and fraudulently converted them rather than paying them over to Bach as materialman. Bach thus sought exemplary damages from Meisner as provided for in Section 32–03–07, N.D.C.C., having alleged that the provisions of Sections 35–12–01 and 12–40–10, N.D.C.C., were applicable. These allegations are outside the scope of our review.

2. The answer further asserted that when the withheld 10% final payment was made by Mary College to Meisner (when the job was certified as satisfactorily completed) Bach would owe to Meisner an additional $175.22.

and an affidavit from James W. Meisner, a former officer of Meisner, stating on information and belief that there was some sort of intercorporate relationship between Bach and Northwestern Sash and Door Company and that the latter had sent salesmen through North Dakota for many years prior to and up until the time in question, that these salesmen had called on Meisner in North Dakota, and that, on information and belief, these salesmen had called regularly on other North Dakota contractors.

In opposition to the dismissal motion, Bach submitted an affidavit from an attorney for James Talcott, Inc. [hereinafter Talcott, Inc.] in which the affiant stated that Modern Door and Lumber Company [hereinafter Modern] purchased the assets and name of Bach; that Northwestern Sash and Door Company was a subsidiary of Modern; and that Modern had used the Bach name as a trade name or the name of a division of Modern.[3]

At the same time that Bach made its return to the motion to dismiss, it filed a motion to substitute James Talcott, Inc. as plaintiff, pursuant to Rule 17, N.D.R.Civ.P. This motion was supported by the affidavit of Talcott's attorney stating that Modern's Bach division assigned the Meisner account receivable to Talcott, Inc. as well as an attachment to the affidavit, captioned "Schedule of Assigned Receivables," and dated June 28, 1968. This "schedule" purported to be an assignment of Modern's (Bach's) Meisner account, but due to the fact that the document was apparently retrieved from microfilmed records the docu-

ment does not indicate to whom the assignment was made nor does it contain the signatures of the parties authorizing the assignment purportedly made.[4]

A consent to substitution signed by Don J. Prettyman, Executive Vice President of Bach, and a consent to substitution executed by someone purporting to be the attorney for Weyerhauser Company[5] were also filed in support of the motion.

Based upon this evidence, the trial judge, in a memorandum opinion dated May 24, 1974, held that Bach was not prohibited by the provisions of Section 10–22–19, N.D. C.C. from bringing the action because the transaction which was the subject of the action was an isolated transaction in interstate commerce at least as to Bach. The trial judge further held that Bach was not the real party in interest but denied Bach's motion for substitution of Talcott, Inc. as party plaintiff because of the inadequacy of the evidence submitted in support of that motion.

As a result of these holdings, the trial judge was left with the question of just who is the real party in interest. The trial judge, in his memorandum opinion, alluded to the fact that the action was based upon a contract which had been performed and complied with to a substantial degree and, apparently, in part, because of this concern, directed Bach's counsel to present a further motion for substitution in accordance with Rule 17, N.D.R.Civ.P., to be heard by the court approximately five weeks later. The trial judge indicated that this further hear-

---

3. A supplemental affidavit was also filed in which James W. Meisner stated that the person who signed the contract on behalf of Bach had advised him (Meisner) that Northwestern Sash and Door Company was a subsidiary of Bach. This supplemental affidavit also stated with more particularity the substance of Meisner's first affidavit in that the supplemental affidavit asserted that a Mr. Sam Sauer of Fargo, North Dakota, had called on the affiant monthly soliciting business for Northwestern Sash and Door Company.

4. Bach argues that the obverse side of this "schedule" contains the signatures effecting the assignment and that these can be discerned through the copy as made. We find the obverse to be illegible.

5. By their consent, Weyerhauser retained the right to receive from Talcott, Inc. the sum of $14,126.12 as its share of any judgment.

ing was being set pursuant to that portion of Rule 17, N.D.R.Civ.P., which provides:

"No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after the objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest . . . . ."

Pursuant to the trial court's direction, Bach's counsel timely filed a second motion to substitute Talcott, Inc. as plaintiff. Additional evidence in support of this motion was as follows:

(1) Further affidavit by Don J. Prettyman as principal officer and shareholder of Modern that Modern was originally incorporated on June 1, 1969;[6] that Modern purchased the assets and name of Bach and of Northwestern Sash and Door, and that these operated as divisions of Modern; that Talcott, Inc. had a security interest in Bach's accounts receivable; that Modern's practice was to make specific written assignments of Bach's accounts to Talcott, Inc. as such accounts came into existence; that Modern specifically assigned the Meisner account through its Bach division to Talcott, Inc.; but that Modern also assigned specific invoices of the Meisner account to Weyerhauser Company, some agreement having been made between Talcott, Inc. and Weyerhauser with respect thereto.

(2) Agreement between Evans Building Products Co.,[7] a Michigan corporation, and Modern whereby Modern purchased the assets and name of Bach in 1963.

(3) Financing agreement dated January 30, 1967, between Modern and Talcott, Inc. providing for security interest in receivables for Talcott, Inc.

(4) Letter dated January 30, 1967, from Modern to Talcott, Inc. informing them that receivables under the Bach name are covered by the aforementioned financing agreement.

(5) Affidavit of Lee Mork, Assistant Vice President of Talcott, Inc. stating that the Meisner account was assigned to Talcott, Inc. in 1968 and 1969.

(6) Attachments to Mork affidavit consisting of another copy of the "Schedule of Assigned Receivables" discussed supra along with a blank copy of what was purportedly printed on the obverse of such a schedule.

(7) Assignment of accounts receivable by Talcott, Inc. to Weyerhauser Company dated January 24, 1969, whereby Talcott, Inc. assigned its interest in Meisner's account receivable in the amount of $14,126.12.

While Bach's counsel was gathering this material, counsel for Meisner was not idle. Meisner filed a second motion to dismiss on the twin bases that Bach as a dissolved corporation had no standing to bring the action and that any assignee of Bach (even if the assignment were properly made) was prohibited by Section 10–22–19, N.D.C.C., from prosecuting the action in the North Dakota courts. This second ground for dismissal was buttressed by an affidavit from John W. Larson, Jr., a Bismarck contractor, who stated that an individual named Sam Sauer, an agent or employee of Northwestern Sash and Door Company, had called on Larson's company regularly during the early and middle parts of the 1960's soliciting business for Northwestern Sash and Door and on many occasions submitted bids on North Dakota jobs on behalf of Northwestern.

Subsequently the trial judge issued a second memorandum opinion, dated Sep-

---

6. We are somewhat at a loss as to how this date of incorporation squares with the assertions of Prettyman in his affidavit as to business carried on by Modern between 1963 and 1969.

7. This case is full of surprises. The name of Evans Building Products surfaced for the first time at the hearing on the second motion to substitute party plaintiff.

tember 24, 1974, and promulgated findings of fact, dated September 30, 1974, that Bach was a dissolved corporation at all times pertinent to the lawsuit; that Bach's claim was not properly assigned to Talcott, Inc.; that before and during the time of the contract in question representatives claiming to be from Bach or Modern regularly called on potential North Dakota customers soliciting business for Bach or Modern; and

"IV.

"That neither E. E. Bach Millwork Company nor Modern Door and Lumber Company were ever registered or authorized to conduct business in the State of North Dakota as provided by the statutes governing foreign corporations doing business in the State of North Dakota."

The trial judge dismissed plaintiff's action because of plaintiff's lack of standing to prosecute same and this appeal from that judgment of dismissal followed.

In exercising appellate jurisdiction it is the object of this court to assure ultimate justice as far as possible to the parties concerned within the appropriate applicable rules of law.

At the outset, we are met with the question of the extent of our scope of review. Meisner argues that our review of the findings of fact of the trial judge is limited to determining whether they are clearly erroneous pursuant to Rule 52(a), N.D.R.Civ.P., which provides, in pertinent part:

"Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."

Rule 52(a), N.D.R.Civ.P., also provides that:

"Findings of fact and conclusions of law are unnecessary on decisions of motions under Rules 12 or 56 or any other motion except as provided in Rule 41(b)."

Rule 41(b), N.D.R.Civ.P., under which the dismissal was granted in the instant action, provides that if the dismissing court "renders judgment on the merits against the plaintiff, the court shall make findings as provided in Rule 52(a)."

We believe that in a case such as the instant case, where the judgment of dismissal was entered on the merits under Rule 41(b), and where findings of fact were made by the trial judge solely upon the record without the assistance of testimony before the court and without the assistance of cross-examination of that testimony, that we may review such record without the restrictions imposed by the "clearly erroneous" test posited by Rule 52(a), N.D.R. Civ.P., for the reason that the "clearly erroneous" standard is clearly apropos in those situations where the initial finder of fact has special opportunities or advantages for assessing the credibility of the witness and the weight to be given to evidence, which are not available to this court. In the instant case, because the evidence consisted solely of documents and affidavits, and no oral testimony, the trial court, the initial finder of fact, is not deemed to possess special opportunities or advantages not possessed by this court (e. g., observation of witness demeanor, observation of effect of cross-examination, etc.), we will therefore examine the findings of fact of the trial judge with an eye to ascertaining whether they are supported by the evidence when all the evidence is considered. This is not to say that we will not grant deference to the initial finder of fact, but merely to say that we will not be constrained within the strict confines of the "clearly erroneous" rule of Rule 52(a), N.D.R.Civ.P., in reviewing the findings in the instant case.

We thus proceed to a review of the findings of fact of the trial judge. The first finding that Bach was a dissolved corporation at all times relevant to the action is clearly supported by the evidence, for example, the certificate of the Minnesota

Secretary of State attesting to that fact and the complete absence of any evidence tending to contradict it.

This finding presumes that E. E. Bach Millwork Company, plaintiff in this action, is the one and same mentioned in the certificate furnished by the Minnesota Secretary of State; whereas the evidence establishes that E. E. Bach Millwork Company in this action is the trade name acquired and used by Modern, which is a corporation. This in itself does not materially change the effect of such finding.

The second finding of fact is as follows:

"II.

"That the claim of the said E. E. Bach Millwork Company was not properly assigned to James Talcott, Inc."

This finding was an explicit rejection of Bach's motion to substitute Talcott, Inc. as party plaintiff, which motion was made pursuant to Rule 25(c), N.D.R.Civ.P., which provides:

"In case of any transfer of interest, the action may be continued by or against the original party, unless the court upon motion directs the person to whom the interest is transferred to be substituted in the action or joined with the original party. . . ."

Bach's second motion for substitution was properly made under the requirement of Rule 17(a), N.D.R.Civ.P., providing that "Every action shall be prosecuted in the name of the real party in interest," because the trial judge had found earlier that Bach was a dissolved corporation at all relevant times and lacked the capacity to bring the action. Bach thus attempted to show that it was a division of Modern (or a trade style used by Modern) at all relevant times in question and that therefore Modern was the real party in interest. Bach (Modern) then attempted to show that it assigned its interest under the contract to Talcott, Inc., and

that Talcott, Inc. had assigned a portion of that interest to Weyerhauser Company, but that Weyerhauser Company had consented to the substitution of Talcott, Inc. as party plaintiff under an agreement whereby Weyerhauser would seek its interest in any judgment obtained solely from Talcott, Inc. as judgment creditor rather than from Meisner.

■ The purpose of the real party in interest rule, as set out in Rule 17(a), N.D. R.Civ.P., is set out in Newby v. Johnston's Fuel Liners, Inc., 122 N.W.2d 156, 159, (N.D.1963), as follows:

"The purpose of the rule requiring that all actions be prosecuted in the name of the real party in interest is to prevent double liability and the vexations of multiple suits. The Minnesota Supreme Court, in explaining their statute which preceded their rule requiring that all actions be prosecuted in the name of the real party in interest, said:

"'The purpose of the statute * * * is to save a defendant against whom a judgment may be obtained from further vexation at the hands of other claimants of the same demand. If a judgment in favor of the plaintiff, when satisfied by defendant, will protect him from future annoyance or loss, and where, as against the party suing, defendant can urge any defenses he could make against the real owner of the claim, then there is an end of defendant's concern, for, so far as he is interested, the action is being prosecuted in the name of the real party in interest.' McGuigan v. Allen, 156 Minn. 390, 206 N.W. 714, at p. 715."

■ In the case of VanSickle v. MacArthur, 110 N.W.2d 281 (N.D.1961), we quoted with approval from Froling v. Farrar, 77 N.D. 639, 44 N.W.2d 763, 765 (1950), the following:

"A real party in interest . . . is one who has a real, actual, material, or

substantial interest in the subject matter of the action . . . ."

Now we must return to the concern evinced by the trial judge in his first memorandum decision when he posited the question: Just who is the real party in interest who should be prosecuting this action? We have pondered this question and have reached the (none too startling) conclusion on the record before us that there is a real party (or parties) in interest; that this party (or parties) is among the mixed bag of possible parties plaintiff which was brought to the attention of the trial court;[8] and that none of those parties has evinced a disinclination in pursuing the action.[9]

■ Having reached this conclusion (and we feel the trial judge probably reached the same conclusion), and being aware that the matter in dispute involves the admitted delivery of worked goods of a negotiated value of approximately $17,000.00 by the plaintiff or plaintiffs to be substituted or joined (or their assignor), we believe that substantial justice can be done in this matter only by remanding this case for further proceedings by the trial court in re the matter of substitution or joinder of the real party plaintiff in interest.

By remanding this case we are not unobservant or uncompassionate with the trial court's dismissal of the action. We believe, along with him, that five weeks should have been a reasonable time for the plaintiff to prepare its second motion for substitution with supporting proofs, and, indeed, the record reflects no objection in that respect on the part of the plaintiff.

In point of fact, we are in agreement with the trial judge when he, in his memorandum opinion on the second motion to dismiss and second motion to substitute (which memorandum opinion was superseded by findings of fact and conclusions of law) alluded to the fact that the plaintiff's motion to substitute party plaintiff was supported by insufficient proofs in the following respects:

(1) Insufficient evidence of a written assignment from Modern to Talcott, Inc. of the Meisner account receivable.[10] (The trial judge is referring to the microfilmed copy of a "Schedule of Assigned Receivables," discussed supra, the obverse side of which purports to be a copy of the written assignment.)

(2) Insufficient evidence as to just who Modern assigned the Meisner account to (whether Talcott, Inc. or Weyerhauser Company), in light of contradictory statements in some of the affidavits proffered by Bach.

(3) Insufficient evidence as to whether the consent to substitution purportedly executed by an attorney for Weyerhauser Company was in fact executed by a person with Weyerhauser's authority to do so.[11]

8. This case, being full of surprises, is not one where we can say with any assurance that matters not yet of record might not force the trial judge, upon remand, to follow a yet more serpentine course in pursuing the transferring of interests in the pursuit of a just disposition on the merits. Naturally, plaintiff's counsel will be required to labor in the vineyard to make the serpentine path negotiable.

9. This is not to say that the real party (parties) in interest, when joined in the action or substituted therein might not choose to prosecute the action since that alternative is a matter of their choice.

10. Section 9–11–08(2), N.D.C.C., provides: " 'Assignor' means any person, firm or corporation who or which, by written instrument, assigns an account receivable for a past or present valuable consideration, by way of sale, pledge or otherwise." However, there may be a further question whether this law or Minnesota law is controlling.

11. However, if the affiant was not so authorized, Weyerhauser should be joined as a party plaintiff to avoid the multiple suits which might result from such a failure to hew to our Rule 17(a), N.D.R.Civ.P., requiring that suit be brought in the name of the real party in interest.

(4) Insufficient evidence of a linkage between the company which purportedly sold the Bach assets and the Bach name to Modern and the trustee for dissolution of Bach. (A unilateral showing would be adequate if supported by competent evidence.)

(5) Insufficient substantiation in many cases of the corporate power or authority of individuals who executed affidavits on behalf of corporate entities.

■ We believe, however, that Bach should have been given additional time to establish these matters to the satisfaction of the trial court. It is apparent that the trial judge was operating under the axiom "Once bitten, twice shy," (and with some justification) when he denied Bach's second motion to substitute party plaintiff. The crux of the matter is, in our opinion, however, not the inadequacies of the proofs buttressing the second motion to substitute party plaintiff, nor whether Bach was given sufficient time to move for substitution with proper proofs, but rather whether Bach fell so far short of such proofs as to indicate that such would never be forthcoming, even with the explicit direction of the trial judge.

Under the facts in this case, and after a review of the entire record therein, we therefore remand this case for an appropriate disposition by the trial judge which should include the allowance of another motion for substitution (and joinder, if plaintiff feels such is applicable), as well as a further motion for dismissal on the part of the defendant.

Further, the trial judge, upon remand, should he feel so inclined, should expect Bach to act with the utmost diligence (consonant with necessary and reasonable time requirements) to put this case in a proper posture for disposition. We cannot expect the trial judge to have the patience of Job in resolving this matter in light of the fact that pre-trial motions are still being heard seven years after the filing of the complaint herein.

The third finding of fact of the trial judge was as follows:

"III.

"That before and during the time of the signing of the alleged contract between E. E. Bach Millwork Company and the defendant Meisner and Company, there were representatives claiming to be from E. E. Bach Millwork Company or Modern Door and Lumber Company regularly calling on potential customers in the State of North Dakota soliciting business for their employer."

This finding, in combination with the fourth finding of fact concerning the fact that neither Bach nor Modern were ever authorized to conduct business in North Dakota, led, in part, to the trial judge's conclusion that the plaintiff had no standing to maintain an action in the North Dakota courts. The trial judge, in so holding, was relying upon Section 10–22–19, N.D.C.C., which provides in pertinent part as follows:

"No foreign corporation transacting business in this state without a certificate of authority shall be permitted to maintain any action, suit, or proceeding in any court of this state, until such corporation shall have obtained a certificate of authority. Nor shall any action, suit, or proceeding be maintained in any court of this state by any successor *or assignee* of such corporation on any right, claim, or demand arising out of the transaction of business by such corporation in this state, until a certificate of authority shall have been obtained by such corporation or by a corporation which has acquired all or substantially all of its assets." [Emphasis supplied.]

The evidence proffered by Meisner indicating that Modern (Bach) was transacting business within the State of North Dakota consisted solely of the affidavits of James W. Meisner, a former officer of Meisner and Company, and of John W. Larson, Jr., another Bismarck contractor. The contents of

these affidavits tended to establish that a Mr. Sam Sauer of Fargo, North Dakota,[12] regularly called on the affiant firms soliciting work for Northwestern Sash and Door Company, Fergus Falls, Minnesota; that these calls occurred up until and during the time of the making of the contract which is the subject of this action;[13] that Sam Sauer submitted bids on various jobs in North Dakota on behalf of Northwestern Sash and Door;[14] that Northwestern Sash and Door made deliveries of the materials under the contract in the instant case in its own trucks;[15] and, that Bach, Modern, and Northwestern Sash and Door had sales and use tax permits from the State of North Dakota at some time during the years 1964 through 1974.[16]

Other evidence tending to support Meisner's contention that Bach is prohibited by Section 10–22–19, N.D.C.C., from prosecuting this action in the North Dakota courts, came from the affidavit of Don J. Prettyman, an officer of Modern, who stated that both Bach and Northwestern Sash and Door Company were divisions of Modern, a foreign corporation.

■ However, even by considering the additional fact that neither Modern nor Northwestern Sash and Door were registered to transact business in this state pursuant to Chapter 10–22, N.D.C.C., in conjunction with the other evidence outlined above, we hold that the sum of these facts does not constitute a sufficient basis upon which to predicate a dismissal in the instant case for failure to comply with Section 10–22–19, N.D.C.C., because proper consideration was not given to Section 10–22–01, which provides, in pertinent part, as follows:

"Without excluding other activities which may not constitute transacting business in this state, a foreign corporation shall not be considered to be transacting business in this state, for the purposes of chapters 10–19 through 10–23 only, by reason of carrying on in this state any one or more of the following activities:

. . . . .

"6. Soliciting or procuring orders, whether by mail or through employees or agents or otherwise, where such orders require acceptance without this state before becoming binding contracts;"

There is no evidence of record in this case as incorporated by the trial judge in his third finding of fact to indicate that the business transactions of Modern within North Dakota coincident with the contract in dispute in the instant case were outside of the ambit of the transactions excluded by this statute from consideration in determining whether Modern was transacting business within this State. Thus, although the trial judge's third finding of fact may be supported by the evidence, such finding without application of appropriate law could not be the basis for concluding that Modern had no standing to sue.

It thus remains for the trial judge to take further evidence on the matter of whether the plaintiff is debarred by Section 10–22–19, read in conjunction with Section 10–22–01, N.D.C.C., from maintaining this action.[17]

Judgment of dismissal is vacated and the case is remanded for further proceedings consistent with this opinion.

12. That Sauer was from Fargo, North Dakota, was asserted only in the Meisner affidavit.

13. Larson states that Sauer called on his firm until the mid-1960's, whereas the contract in dispute was entered into in May 1967.

14. This found only in the Larson affidavit.

15. Meisner affidavit.

16. A letter to this effect from the office of the North Dakota Tax Commissioner was attached to the affidavit.

17. We presume a further motion for dismissal by Meisner will set before the court additional operative facts which will require a further study in re the question of whether Bach or Modern were transacting business within this state so as to debar them or their assignees from prosecuting this action.

In the interest of justice, no taxation of costs are allowed on this appeal.

ERICKSTAD, C. J., and PAULSON, PEDERSON and VOGEL, JJ., concur.