This is a will contest in which the court submitted to the jury the issue of mental incompetency and undue influence and contestant had verdict and judgment. Judgment non obstante and new trial were denied.
The judgment must be reversed because there was no jury issue of mental incompetency. The capacity of testator to make a will was attested by five doctors, one a psychiatrist, called to examine him at the time, and by friends, neighbors and relatives, including contestant and members of his family. There was no testimony to the contrary. Eldora's conduct in bringing proceedings against testator precludes a claim of insane delusion. In re Barlum's Estate, 240 Mich. 393. The inquiry is whether the case presents a question of fact of undue influence. Upon this issue the testimony and inferences must be taken most favorably to contestant.
Alexander D. Lake died February 26, 1934, at the age of 102 years. He had three children, Eldora, *Page 677 
John, and Lydia Bale. He had been a farmer and had moved to Vermontville, where his wife died in 1915. He asked Eldora to move into his house and sold him the premises for $1,200, reserving the right of a home therein during his life. He paid board of $3 per week, and lived with Eldora and his wife until the latter died in March, 1929. Alexander was then 98 and Eldora 66. They discussed plans, neither desired to hire a housekeeper and board the other, and Alexander went to live with John on a farm. He stayed with John about five months. John felt he could not afford to keep his father for $3 per week and told him so. In the fall of 1929, testator went to live with Lydia at Fennville, and paid her $7 per week.
There was little testimony of the subsequent relations between John's family and testator. Eldora visited his father occasionally at Lydia's. Their relations were friendly. The father evidenced no ill-feeling toward Eldora or John. He had a good home with Lydia.
In 1924, Mr. Lake, having about $11,000 in the Vermontville bank, wanted to provide for its equal division among his children in case of his death and to avoid probate proceedings. Accordingly he took out three certificates of deposit, each for $3,868.64, running to himself and each of the children respectively and payable to either or the survivor. Thereafter the certificates were renewed in like form from time to time but in different amounts, because he gave or loaned money to the children and deducted the amount from the certificate in which the favored child was joint payee. This equal division among the children appears to have been a rather fixed idea with testator because at one time he gave Eldora *Page 678 
stock worth $800 because he had given like amount to each of the others and, after John died in February, 1931, his wife Ida was substituted for him in a certificate as joint payee. The last renewals were in June, 1931, when the amounts were, in round numbers, Eldora, $4,500; Ida, $3,500; Lydia, $2,900.
Lydia had a cancer. October 17, 1931, she appeared at the Vermontville bank with the Eldora and Ida certificates and a letter, written by herself but signed by testator, the letter asking for a draft for the certificates, stating testator wished to deposit the money at Fennville, where he could attend to it better, that Lydia's certificate would remain in the Vermontville bank, and asking that the transaction be kept strictly confidential. Lydia's certificate, later presented through another bank, bears on the back an assignment of it from testator to her and indorsement by her to her son Lacey. Lacey said the assignment and indorsement were made about November 20th, which was after Lydia's death. He cashed the certificate, took a new one in his own name, held it a year and a half and then transferred it to testator.
The bank refused to give Lydia the money and at once notified Eldora. The next day he went to see his father, who told him that he had no intention of taking the money from the Vermontville bank, it could remain there as long as he lived, but, dropping his head, said he had signed some papers. October 27th, testator signed another letter written by Lydia, addressed to the banker, and asking him to hasten the transaction. About a week later Lacey and Lydia's son-in-law, Ernie Crane, called at the bank, demanded the money or certificates, and the banker refused to deliver them. Lacey took up the *Page 679 
matter with the banking department and prosecuting attorney.
October 30th, Eldora instituted proceedings in probate court for a guardian for his father upon the ground of mental incompetency and was appointed special guardian. He filed a bill in chancery to restrain the bank from turning the money over to Lydia. Service was had upon Lydia Bale but not upon testator.
Sunday, November 1st, an attorney was called to the home of Lydia Bale. He drafted pleadings in the probate and chancery proceedings and also prepared a bill for accounting and injunction in behalf of testator against Eldora and the Vermontville bank. To complete the subject it may be said that on November 19th the original proceedings were dismissed on stipulation and, on November 21st, an order was entered in testator's suit requiring the bank to pay the money to the clerk of court, and, on December 19th, a consent decree was entered to pay the money to testator.
On November 1st also a will was drafted for testator, which bequeathed $100 each to Glenn, son of Eldora, to two children of John, and to three grandchildren of John; forgave a note of Ida's for $500; made no provision for Eldora; and gave all the residue to Lydia, with provision that, in case of her prior death, it should be divided among her six children (who were Anna Crane, Nina Arnold, Freda Bale, and Lacey, Ned and Roy), in equal shares, children of a deceased child to take its share and husband of Anna to take her interest in case of her prior death.
The circumstances and situation at the drafting of the will are in sharp dispute. Two witnesses testified *Page 680 
that Lydia Bale was sick in bed. The attorney, his stenographer, the testator and some of Lydia's children gathered in her bedroom and Lydia dictated the will; Lydia's orders for disposition of the property were repeated to the testator, who was quite deaf; it was necessary to repeat some of them several times and in each case he merely nodded his head, or said "Huh;" Lydia started by saying that, "We will give" John's children $100 each and his grandchildren $100 between them; the attorney asked why John's children were given so little and Lydia agreed upon a bequest of $100 each to the grandchildren; Nina objected and insisted that the grandchildren (evidently referring to Glenn, Eldora's son), should all share alike even though the testator wanted to disinherit Eldora; Lydia then said that the rest of the property would go to her and if she did not get well it should go to her children because they would take care of testator. The will was drafted and signed the next day by two reputable witnesses from Fennville, brought there by Ned Bale. There was also testimony that upon that occasion, in the presence of testator, Lydia said that Eldora had mistreated testator, had failed to provide a home for him, and Anna and Ned made similar statements. The witness said she had heard those persons make similar remarks to testator many times. Testator was greatly incensed at Eldora for commencing the proceedings to declare him an incompetent and to tie up his money, and complained that "it was sharper than a serpent's tooth to have a thankless child."
Lydia died November 14th. Testator said he would not permit Eldora to come to the funeral and later told a friend that if Eldora had come he would have beaten him with his cane. At the funeral, tesator *Page 681 
told John's son, Ellis, that he had made his will, John's wife and children would receive John's share and Ellis would get a small portion. On that occasion Anna told Ellis not to pay any attention to testator as he did not realize what he was talking about.
November 28th, the same attorney drafted a new will for testator, identical in substance with the first, except as it recites the death of Lydia, and instead of giving Roy's share to him it was given to children of his two marriages. This will was witnessed by the same witnesses as the first will. There is little testimony as to the drafting or execution of the will and no showing of reason for change as to Roy or who suggested it.
On November 30th, Eldora's son Glenn attempted a reconciliation between testator and his father. He talked with testator and also presented to him written memorandum in which he set out the kindnesses of Eldora and his wife to testator, and the latter remembered them. Testator said he could not ask Eldora to come to see him; about the last thing Lydia had made him understand was not to welcome Eldora into the house; he had said he would never see Eldora; but he could not hold a grudge and if Eldora would come he would talk with him but would not talk business. Eldora went to see his father shortly after but the father refused to talk business matters with him.
After Lydia's death, deceased remained in her home for a time, Nina keeping house for him. After Nina died he lived with Anna at Fennville until his death. During this time Ned kept some of testator's money in his safety deposit box. The record does not indicate that Ned and Lacey did not account to testator for all his money they had. *Page 682 
The case is not free from doubt. As to the first will, the testimony clearly would present a jury question of undue influence by Lydia. An inference that her influence survived her death, and, with that of her children, wrought the second will, has some support in circumstances. The disinheritance of Eldora is understandable. But no reason appears for the provision for John's family. It was foreign to testator's fixed idea of equal division, long entertained and acted upon, and apparently still in his mind as to John when he talked with Ellis at Lydia's funeral. It would seem that some strong force had overcome the idea or he was misled as to the effect of the will.
Testator remained in an atmosphere conducive to continuance of the influence because he was among those who had fostered and aided in it. The shock of Eldora's litigation and of Lydia's death could have produced a state of mind more or less confused and susceptible to control by others. Lacey's taking charge of testator's money might indicate a domination.
The identity of the wills, with an absence of testimony as to the circumstances of the execution of the second will and its complete divorcement from the prior influence, has some significance. And there is the incident of testator's refusal of full reconciliation with Eldora because of Lydia's injunction to him and his promise to her. The testimony and inferences present an issue for the jury.
Proponent raises some points regarding admission of testimony, most of which will not arise on another trial.
Whether statements in the presence of testator were heard, understood by, and influenced him, is a question for the jury. *Page 683 
Statements of Lydia not made in the presence of testator were introduced to support the claim of undue influence. Admissions of one of several legatees are not admissible to show undue influence. In re Spinner's Estate, 248 Mich. 263. The rule may not be avoided by a claim that some of the legatees engaged in a conspiracy to dominate the will.
Reversed with new trial, and costs to proponent.
POTTER, C.J., and NELSON SHARPE, NORTH, WIEST, BUTZEL, BUSHNELL, and EDWARD M. SHARPE, JJ., concurred.