## Austin DUMAS *v.* Leona DUMAS and Cecil R. Dumas ACKER

76-294                                        547 S.W. 2d 417

### Opinion delivered February 28, 1977
### (Division II)
[Rehearing denied April 4, 1977.]

*McKay, Chandler & Choate,* for appellant.

*Keith, Clegg & Eckert,* for appellees.

DARRELL HICKMAN, Justice. This is an appeal from decisions of the Columbia Chancery and Probate Courts on three cases consolidated for trial.

Leona Dumas, former wife of Wray Dumas, filed a lawsuit to cancel a deed from Wray to his brother, Austin, alleging fraud; Wray's daughter, Cecil Ray Dumas Acker, con-

tested the probate of his will as being a product of an insane delusion; and she also filed a suit to set aside the deed from her father to his brother alleging it was a product of an insane delusion.

The lower court tried all three cases at one time. The chancellor held Wray Dumas did sign the deed to defraud his wife, and the deed and will were the products of Wray's insane delusion. Wray's brother, Austin, appeals the decision and alleges four errors: (1) The court erroneously found Wray Dumas suffered from delusions; (2) The will was not a product of an insane delusion; (3) The deed was not a product of an insane delusion; and (4) The lawsuit filed by Leona to cancel the deed is now moot.

The only real issues are did Wray Dumas suffer from an insane delusion and were the legal instruments products of that delusion?

This is a tragic family matter and some background is necessary to understand the legal problem. When Wray died in October, 1975, he was 67 years old. He and his wife, Leona, were married in 1928 and they had only one child, a daughter, Cecil Ray. Leona testified their trouble started in about 1957 when Wray had an affair with another woman. She forgave him, but noticed he could not get out of his mind the idea that their friends in church knew about his affair and were watching him. She testified in great detail about the general deterioration of his conduct; his drinking, cursing and violent nature.

In 1969 his daughter initiated proceedings to have him committed to the Arkansas State Hospital. Dr. Joe Rushton, his family doctor, stated Wray had a complete change of personality in 1969. He diagnosed Wray's illness as paranoid schizophrenia. Dr. Ruston stated he saw Wray after he was released from the hospital, and although he was improved, he soon reverted to his former mental condition.

The state hospital psychiatrist testified Wray was in an involutional paranoid state. He said Wray was unable to separate the real from the unreal and suffered from delusions of persecution.

In 1972 Leona left Wray and filed for divorce. The divorce was granted in April of 1974 and she was awarded $17,000.00 cash and $100 a month alimony. The will was signed in March, a month before the divorce; the deed was signed in September, after the divorce. Wray's will left all his property to his nephew and brother. The deed for 37 acres, to his brother, had "gift" handwritten on it. Wray did not pay Leona alimony and she obtained a judgment against him for $1,400 on April 16, 1975.

Leona did not collect the judgment in full and filed suit in May of 1975 to set the deed aside, alleging he was trying to defraud her. Wray died in October before the lawsuit could be tried.

Austin Dumas argues on appeal that there was no insane delusion, and even if there was, the documents were not a product of the delusion. Normally, a case involving a will or deed turns on the mental incapacity of the maker or the undue influence of a friend or relative. However, Arkansas does recognize the principle that a legal instrument may be set aside if it is the product of an insane delusion. An insane delusion is one which has no basis in fact; the conception of a fact which in reality does not exist. If there is any basis in fact for the delusion, then it is not such a delusion to warrant setting aside a legal instrument. Furthermore, the instrument must be the product of the delusion. *Taylor* v. *McClintock,* 87 Ark. 243, 112 S.W. 405 (1908).

Wray Dumas was a sick man. The doctors testified he suffered from a persecution complex, had hallucinations and was a paranoid schizophrenic. He became obsessed with the idea that the people in his church were against him. His friends from church, one after the other, testified there was no truth to his idea that everyone in church watched him. He tried to get his family to leave the church. His wife of many years stated she had to leave him because she couldn't stand his conduct any longer. His daughter, apparently very devoted to him, tried to get him medical help, and he turned on her. Even his grandson, by his only child, testified about his deteriorating mental condition.

The appellant argues that since the church did have a

meeting to apologize to Wray, there is proof that the delusion had some basis in fact. The members all stated Wray demanded a meeting and an apology. There was a meeting of the church members and they apologized to Wray for whatever it was they were accused of doing; however, not a single witness felt that there was any basis for Wray's accusations nor any real reason to apologize. Shortly after the meeting, Wray quit attending church.

The doctor from the state hospital testified at length about Wray's delusion. Some of his testimony is particularly relevant.

Q. Insofar as his ability to function outside this delusional area, would you explain how this operates and if in fact it does operate on that basis?

A. With exceptions of delusional symptoms, in that he would not go to church because he felt they owed him an apology and he would not comment or expound on the difficulty he was having with his daughter and son-in-law and marriage, outside of that he was able to work and carry on business and transact business. Tr. 171.

Q. Wray Dumas was able to function in society, was he not?

A. Outside of his delusional system, yes. Tr. 173.

MR. CHANDLER: If in fact Wray Dumas was operating with delusions that related to his daughter, could those delusions tend to play any part in his decision at the time he executed a Will?

A. I think it would. Tr. 174.

In summary, the doctor testified that the delusional system involved his church and his family and that to Wray, the trouble he was having at church and with his family was very real. However, the record does not reveal any basis in fact for his feelings against his family and the members of his church and, therefore, the finding of the chancellor that there was a delusion is supported by a preponderance of the evidence.

It should be emphasized, this is not a case involving merely an eccentric person, who out of simple resentment or revenge, leaves his property to someone other than his immediate family. Wray tried to get his family to quit going to church and after his commitment to the state hospital and the divorce, became convinced that they were all against him. His will was changed in March before the divorce to leave his daughter nothing; the deed was signed after the divorce, after his former wife tried to collect alimony from him. The finding of fact that Wray signed the legal instruments because of a delusion is not against the preponderance of the evidence.

We have held many times that in matters regarding credibility of witnesses and findings of fact, we will affirm the chancellor if the findings are not against the preponderance of the evidence. *Simpson* v. *Martin,* 174 Ark. 956, 298 S.W. 861 (1927).

It is difficult to understand the appellant's argument the deed question is moot. The lower court found, as a fact, the deed was made to defeat Leona's claim for alimony. This finding, together with the other findings, will insure an orderly disposition of the probate of Wray's estate. Any cause of action or claim any party may have as a result of this litigation is a separate matter. We find the chancellor acted correctly when he made separate findings for all three lawsuits.

Affirmed.

We agree. HARRIS, C.J., and FOGLEMAN and ROY, JJ.