In the Matter of the ESTATE of Chris Geo. KOCH, Deceased.

Arlene STEINER, Anton J. Steiner, Russell J. Koch, Lena Granier and Margaret Dietzman, Petitioners and Appellants,

v.

Marlys A. DICKMEYER, Lela M. Grim, Karla J. Robinet, Connie K. McMaines, and Larry A. Koch, Respondents and Appellees.

Civ. No. 9374.

Supreme Court of North Dakota.

Nov. 10, 1977.

Morris A. Tschider, and Richard P. Rausch, Bismarck, for petitioners and appellants; argued by Morris A. Tschider and Richard P. Rausch, Bismarck.

Lundberg, Conmy, Nodland, Rosenberg, Lucas & Schulz, Bismarck, for respondents and appellees; argued by Irvin B. Nodland, Bismarck.

ERICKSTAD, Chief Justice.

This is an appeal from a judgment of the Burleigh County District Court, affirming a decree of the county court, which denied admission to probate of the purported Last Will and Testament of Chris Geo. Koch. The appellants, proponents of the will, are the deceased's brother, brother-in-law, and sisters, and the appellees, contestants of the will, are his five children.

The issue in this case is whether or not the Last Will and Testament of Chris Geo. Koch dated March 11, 1974, was the product of insane delusions rendering the will null and void for want of testamentary capacity.

The decedent, Chris Koch, married Elizabeth Koch in 1940. There were five children born of this marriage, the appellees in this case. Chris was essentially a farmer, but for a number of years he also hauled propane for the Farmers Union Oil Company on a commission basis.

According to Elizabeth Koch, there were no significant marital problems until the 1960's. In the 1960's, problems started to arise as Chris became suspicious of his family and became very depressed, showing suicidal tendencies.

Chris' daughter Lela testified that in 1964, Chris, while shaking and crying, related to her that her mother was bad. He stated that she never did anything and was running around with other men. The next day he told his daughter that he had tried to tip the truck over when he was driving so as to kill himself. Lela then set up an appointment for Chris with Dr. Thakor, a psychiatrist in Bismarck. After this meeting, Dr. Thakor recommended that Chris be admitted to the psychiatric ward of the St. Alexius Hospital, but Chris objected. He did let himself be admitted to a medical ward of the hospital, and remained there for about a week.

Chris' son Larry testified that in 1965, Chris said to Larry that he had that day tried to kill himself by trying to turn over his truck. He went on to state that he had no reason to live, he wanted to die, and he pictured himself often hanging from a beam by a rope. Later that day, Larry and his mother found the truck running in the garage with the door closed and with Chris lying alongside the truck. Larry testified that when they got him outside, Chris kept saying, "Nobody cares and I want to die."

In 1969, Chris suffered a severe heart attack and was hospitalized for over a month. During this time, his wife and children spent long hours in the hospital and at his bedside. Following this heart attack, according to Elizabeth and the children, they noticed disintegration of his mind. They all stated that they came to the realization that Chris was sick mentally as well as physically.

Larry Koch testified that he was told by his father many times after 1969 that he wanted to die and that nobody cared for him. He said this occurred several times after Chris had heart pains, and often he refused to be taken to the hospital or to have his medicine. At times Larry had to force him to get help or to take his medicine.

During this time, according to Larry, Chris accused his wife of being an alcoholic and being unfaithful to him. There were periods, sometimes for months in duration, when he would not speak to his wife.

Larry testified that there were also a couple of incidents when Chris yelled at and pushed him for no apparent reason. He then became silent, and the next day he would be all right again. Larry also testified that in March, 1973, Chris exploded one evening during dinner for no apparent reason and threatened to go downstairs and shoot himself. He had to be physically restrained by Larry at that time.

According to his daughter Connie, she also was told by her father, after 1969, of his suicidal thoughts and his suspicions of her mother. She testified that he stated that everybody was plotting against him, including his friends. She also said that he portrayed himself differently when non-family persons were around. He would be in deep depressions and be relating his delusions; the next moment a neighbor would come over and his personality would change within seconds and he would be normal again.

Dr. D. A. Miller was Chris' physician following the heart attack in 1969, and saw him frequently from 1969 to 1973. He saw Chris both as an outpatient and as an inpatient as Chris was hospitalized several times during that period for his heart condition. Dr. Miller testified that by early 1973, he concluded that Chris needed psychiatric help because of his depression and his suicidal tendencies.

Chris, in 1973, did come under the care of psychiatrists after some more overt gestures at taking his own life. In January and February of 1973, he saw several psychiatrists and counselors at the Memorial Mental Health Center in Mandan and at St. Alexius Psychiatric Service in Bismarck.

Dr. Gaebe, in his psychiatric evaluation of Chris, stated:

" . . . It was also evident throughout the interview that he uses projection to a great degree, that he is quite suspicious of and angry with his wife and at least several of his children feeling that the children and his wife are against him. He does admit to suicidal thoughts . . . ."

In his hospital records from St. Alexius Hospital is a discharge diagnosis of Chris on February 9, 1973, made by Dr. Gaebe. This discharge diagnosis stated:

"Involutional psychotic depressive reaction, with paranoid feelings toward his family."

Dr. Miller, in March, 1973, advised Chris' family that if Chris would not voluntarily seek treatment, the family should seek to have him committed. The family agreed to do this, and to carry out this decision, the two eldest daughters signed the petition for a mental health board hearing. On April 2, 1973, a hearing was held before the Burleigh County Mental Health Board. Elizabeth Koch and the two eldest daughters appeared and testified to the necessity of a commitment to the hospital. There were several neighbors and relatives who appeared and testified against commitment. Dr. Miller did not attend the hearing but sent a letter which stated:

"Over the last several months the patient had become extremely depressed and on many occasions has verbalized death wishes to me. Because of his severe depression and because of recurrent obsessive thoughts that his wife was unfaithful to him and that his family was unfaithful to him and recurring expressions of wishing to die he was admitted to the St. Alexius Psychiatry Service on February 4, 1973, under the care of Dr. Gaebe. Since that time he has intermittently been followed by Dr. Gaebe at the Memorial Mental Health Center but the patient has shown no improvement and has shown resistence to treatment and has broken off going to the Mental Health Center for help. He has continued to be extremely depressed feeling that he is living in hell at the present time and that his family is all against him. His repeated statements to his wife in regard to her inability to care for him and his feelings that she is having affairs with other men whenever she leaves the home have caused his wife to have an acute mental break herself. His wife spent a week in St. Alexius Hospital this past week due to an acute severe anxiety reaction related to Chris' behavior at home."

The mental health board determined that Chris should not be committed. Shortly after that hearing, Chris wrote letters to Larry and Connie telling them never to come home again. On April 7, 1973, Chris allegedly executed a will disinheriting his wife and children.

Soon thereafter divorce proceedings were commenced and a hearing was held on December 22, 1973. In the time between the commitment hearing and December 22, there was little, if any, contact between Chris and the other members of the family.

At the divorce hearing, three children testified in support of their mother's effort to secure one-half of the property. After the hearing ended on December 23, according to Larry's and Connie's testimony, there was a tearful meeting of the family when the children all expressed their love to their father. Through the divorce decree of January 30, 1974, each party received one-half of the property. Between that time and Chris' death on October 29, 1976, there were unsuccessful attempts at a reconciliation between Chris and Elizabeth. Chris also spent some time with each of his children during that period. On March 11, 1974, Chris signed the will and testament which is being contested in this case. In that will, he specifically excluded his former spouse and children and gave his property to his brother, brother-in-law, and sisters.

There was also testimony from several persons, that Chris was able to function well in society. His neighbors thought that he was completely competent, and apparently had no knowledge of his mental problems and suicidal tendencies. Chris told several people, after the divorce hearing, that his children had sided with their mother and against him at the commitment and divorce proceedings. He also told several people that he thought the commitment proceeding was commenced to get his money.

Dr. Clifford Peters, who treated Chris' heart condition from April 4, 1973, until Chris' death, testified that Chris appeared

perfectly rational to him. He testified that Chris' mental capacity was quite adequate and that he found no indication of any psychosis. Finally, he testified that Chris' previous difficulties might have been induced by the heavy medication that he was then taking for his heart condition.

Morris Tschider, who did legal work for Chris including the preparation of the will in question, testified that Chris knew what he owned, what it was worth, who his family consisted of, and what he was doing at the time of the execution of the will on March 11, 1974. He went on to testify that Chris told him that he thought the mental commitment hearing was the first step of the divorce. Tschider, who testified that he did legal work for Chris from 1965 until his death, also stated that Chris was always completely competent and was very intelligent.

After Chris died, an objection to probate of his will was filed on behalf of the children on November 15, 1976. The matter was heard on November 19, 1976, by the Burleigh County court with increased jurisdiction. By order dated December 30, 1976, the county court determined that this will was null and void for want of testamentary capacity, and that it was not entitled to be admitted to probate. The appellants in this action served notice of appeal, and subsequent thereto the parties entered into a stipulation dated March 3, 1977. In this stipulation, the parties agreed that the appeal would be presented to the fourth judicial district court in Burleigh County on the basis of the record from the county court. On May 4, 1977, the district court concluded that the will and testament of the decedent was null and void for want of testamentary capacity.

The pertinent part of the findings of fact, conclusions of law, and order for judgment, reads:

"The Last Will and Testament of Chris Geo. Koch dated March 11, 1974 is the product of an insane delusion and the decedent devised his property in a way which, except for the delusions, he would not have done."

It is from the judgment rendered on those findings that appeal is taken to this court.

The first question confronting us is our scope of review in this case. We have said in the past that the question of whether a testator is laboring under an insane delusion which materially affects the will is a question of fact. *In re Estate of Rask*, 214 N.W.2d 525 (N.D.1974); *Kingdon v. Sybrant*, 158 N.W.2d 863 (N.D.1968). We have also stated that we will apply Rule 52(a), N.D.R.Civ.P., to this finding of fact, and that therefore, unless the finding is clearly erroneous, the decision of the trial court based on that finding will be sustained. *In re Estate of Rask, supra.*

■ In this case we have a situation where both a county court and a district court heard this case below. Normally, when this occurs, this court is to determine whether the findings of the last court appealed from are clearly erroneous. *In re Estate of Rask, supra*, and *In re Estate of Elmer*, 210 N.W.2d 815 (N.D.1973). Thus, normally, we would apply the clearly erroneous test of Rule 52(a), N.D.R.Civ.P., to the findings of fact of the district court.

■ However, in this case there is a special problem as the parties stipulated that the appeal from the decision of the county court would be presented to the district court on the basis of the record from the county court. Do we now apply Rule 52(a), N.D.R.Civ.P., to the finding of fact of the district court, that Chris Koch's will was a product of an insane delusion, when that finding of the district court rested solely on documentary evidence, *i. e.* the record of the county court?

There is a great split among the state courts and among the federal courts as to the applicability of Rule 52(a) in these situations. One view is that Rule 52(a) applies even when the trial court's findings of fact are based solely on documentary evidence. *See* Wright & Miller, Federal Practice and Procedure: Civil § 2587. A second view is that Rule 52(a), does not apply to findings of fact based solely on documentary evidence. *See* 5A Moore's Federal Practice (2d.ed.) ¶ 52.04.

In *Dolajak v. State Auto. & Cas. Underwriters*, 252 N.W.2d 180 (N.D.1977), we resolved this issue in North Dakota by adopting the position expounded by Moore's Federal Practice. In that decision, we discussed the applicability of Rule 52(a), N.D. R.Civ.P. in that case, and stated:

"We conclude that the evidence considered by the trial court consisted of documentary evidence and that this court is as capable of reading and understanding the documentary evidence as is the trial court, and that this court therefore is not required to follow Rule 52(a), NDRCivP, under such circumstances." 252 N.W.2d at 182.

*See also Bach Millwork Co. v. Meisner & Co.*, 228 N.W.2d 904 (N.D.1975), for a similar holding.

The United States Supreme Court has found a solution in the two-court rule to the dilemma facing us. In *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 336 U.S. 271, 69 S.Ct. 535, 93 L.Ed. 672 (1949), the Supreme Court, on a writ of certiorari, heard a case in which the United States Court of Appeals upheld part of the findings of a United States District Court that a patent was valid and infringed. In affirming the circuit court, the United States Supreme Court said:

"A court of law, such as this Court is, rather than a court for correction of errors in fact finding, cannot undertake to review concurrent findings of fact by two courts below in the absence of a very obvious and exceptional showing of error." 336 U.S. at 275, 69 S.Ct. at 538, 93 L.Ed. at 677.

*See also United States v. Reliable Transfer Co., Inc.*, 421 U.S. 397, 401, 95 S.Ct. 1708, 1711, 44 L.Ed.2d 251, 256–257 (1975); *Berenyi v. District Director, Imm. & Nat. Serv.*, 385 U.S. 630, 87 S.Ct. 666, 17 L.Ed.2d 656 (1967).

■ Applying that rule to this case, what do we find?

There have been three North Dakota cases in the past dealing with insane delusions. The first case was *Edwardson v. Gerwien*, 41 N.D. 506, 171 N.W. 101 (1919).

In that case the testator gave property to a sister and a niece and excluded from his will, four sisters, two brothers, and his father. The contestants alleged that the testator lacked testamentary capacity due to an insane delusion that his relatives were trying to get his property from him, and that they were trying to starve him. This court held that the testator was not suffering from an insane delusion and went on to say:

"We are of the opinion the appellants would have to go much further and prove that what was claimed to be an insane delusion—that is, that his relatives were striving to get all his property from him—was in fact false; that such statements of the testator with reference thereto had no basis in fact, and were not founded in reason or probability; that the matters claimed to constitute a delusion had no real existence, but were purely a product of the imagination. It would seem, if there were any evidence, even though slight or inconclusive, which may have contributed to the belief held by one claimed to be afflicted with the delusion, then his belief cannot be said to be a delusion." *Edwardson v. Gerwien, supra* at 103.

The second North Dakota case dealing with insane delusions was *Kingdon v. Sybrant, supra*. In that case the alleged insane delusion was that the testator's first wife was unchaste and that his daughter was, therefore, illegitimate. This court did not get to the merits of that case, but granted a new trial on the grounds that erroneous and prejudicial instructions were given at the trial level. This court did, however, set out the substantive law to be followed in North Dakota in the syllabus.

"1. There is a presumption that a testator was sane at the time of the execution of his will, until the contrary appears by competent proof, and where one is contesting proof of a will on the basis that the testator was suffering from an insane delusion, it is not sufficient to introduce evidence which tends to prove that the testator was possessed of such a

delusion, but there should be further proof by the contestant that such delusion has no foundation in fact or in probability in order to show that the delusion is wholly a product of the imagination.

"2. Whether a testator is laboring under an insane delusion which materially affects the will is generally a question of fact, and to defeat a will on the ground that the testator lacked testamentary capacity because of an insane delusion, it is not sufficient to establish that the testator was the victim of such a delusion, but the evidence must go further and establish that the will itself was the product of that delusion and that the testator devised his property in a way which, except for that delusion, he would not have done." *Kingdon v. Sybrant, supra* at 864, Syl. ¶¶ 1–2.

The third case was *In re Estate of Rask, supra.* In that case we held that the testator's will was the product of an insane delusion that his niece was his daughter. Because of the closeness of their ages, the testator could not have been the father of his niece. Furthermore, there had been no long-standing close relationship between the testator and his niece. This court, in finding that the will was the result of an insane delusion, followed the law as set out in syllabus paragraphs 1 and 2 of *Kingdon.*

The law in North Dakota is therefore quite clear as to the effect of insane delusions. The problem comes not in knowing the law, but in applying the law to the facts of this case where it is asserted the insane delusions preceded any possible factual basis for the disinheritance.

The county court applied this law to the facts of this case, and in its memorandum opinion, stated:

"The sequence of events just described is sadly ironic. When the decedent's children attempted to have him committed for treatment, it had the effect of reinforcing his paranoic beliefs that his children were all against him and supported their mother. When he pursued the divorce, the children testified on behalf of the mother which again fueled the decedent's belief. It is a classic case of the self fulfilling prophesy. Because of his beliefs, the decedent cut himself off from his family and thereafter considered this status as 'proof' that he was uncared for and unwanted.

"It is clear to me that the decedent's feelings toward his children were produced by beliefs held by the decedent which were unfounded in fact and that these beliefs were the reason the decedent excluded his natural objects of bounty from his will.

"I conclude therefore that the Last will and testament of the decedent is null and void for want of testamentary capacity and that the same is not entitled to be admitted to probate."

The district court on appeal after reviewing the record, also stated that the Last Will and Testament of Chris Koch was a product of an insane delusion, and the decedent devised his property in a way which, except for delusions, he would not have done.

The appellants, proponents of the will, contend that the county and district courts erred in their findings of fact. They contend that Chris' will was a product of his feelings toward the members of his family based in fact upon what he believed to be, rightly or wrongly, their disloyalty and disinterest toward him. They stressed the impact that the mental commitment hearing and the divorce proceeding had on Chris. In the commitment hearing, two of his children testified for commitment, and in the divorce hearing, three of the children were called by his wife's attorney. In neither proceeding did any of the children testify on Chris' behalf. At least in Chris' mind, the children had sided with their mother and against him in these proceedings. This, the appellants claim, is sufficient to show that Chris had a factual basis for his belief that his children were against him. This belief, they argue, is therefore not wholly the product of Chris' imagination, and therefore cannot be an insane delusion.

In support of this argument, the appellants cite *Estate of Karabatian v. Hnot,* 17

Mich.App. 541, 170 N.W.2d 166 (1969), and *In re Millar's Estate,* 167 Kan. 455, 207 P.2d 483 (1949). In *Karabatian,* the court held that the testator was not suffering from an insane delusion when he wrote a will leaving out the contestant, an attorney. The court stated, in support of this finding, that:

> "Although contestant did not attempt to place decedent in an insane asylum, there existed ample factual basis from which decedent may have reasoned, even though incorrectly, that he had attempted to do so. Contestant having clearly established, rather than disproved, the existence of a factual basis for decedent's belief, there remained no fact to be submitted to the jury." 170 N.W.2d at 168.

Further support for the appellants' argument that the commitment proceeding in this case supplied a factual basis for Chris' beliefs about his children can be found in 175 A.L.R. 882, 907:

> "Frequently relatives are disinherited by an eccentric testator because they have at some time brought commitment or guardianship proceedings against him. Ordinarily, his resulting animosity, even expressed in such accusations as that they were trying to get his property away from him, or had no affection for him, cannot be found to be an insane delusion. *Re Lacroix* (1933), 265 Mich. 59, 251 N.W. 319; *Re Lake* (1935), 271 Mich. 675, 260 N.W. 779 (son); *Re Balk* (1941) 298 Mich. 303, 298 N.W. 779 (children)."

The case of *In re Millar's Estate, supra,* deals with the effect of the children testifying against their father in a divorce hearing. In that case, the court held that the testator was not suffering from an insane delusion that his children were against him. The court stated that from the record it appeared that the testator was mistaken in his belief that his two daughters had turned against him, but pointed to the fact that the daughters had sided with their mother at a divorce hearing as a basis for the testator's belief.

A similar case is *Bain v. Cline,* 24 Or. 175, 33 P. 542 (1893), in which the court stated that the testator was not suffering from a delusion that the children were opposed to him. For support of this statement, the court pointed out that the children had testified for their mother at a divorce hearing and that this was sufficient basis for the testator's belief.

Finally, the appellants argue that even if Chris did suffer from some insane delusions, that there is no proof that these delusions affected his will executed on March 11, 1974. The appellants stress the fact that the last report from a psychiatrist was in February 1973. Furthermore, they claim that there is not sufficient proof that Chris' alleged delusions by themselves affected the will.

In support of appellants' argument is *McGrail v. Rhoades,* 323 S.W.2d 815 (Mo. 1959). In that case, the court in discussing the substantive law concerning insane delusions, said:

> "But, the mental error must have actually been operative in the production of the instrument, in the testamentary act, and although there was a delusion if the testator was in fact motivated by other rational reasons his will may not be set aside because of monomania. *Lareau v. Lareau,* Mo., 208 S.W. 241; *Benoist v. Murrin,* 58 Mo. 307, 323–324; *Hall v. Mercantile Trust Co.,* 332 Mo. 802, 59 S.W.2d 664." 323 S.W.2d at 821.

The real difference in the instant case then, between the appellants' view and that of the county and district courts, is the effect of the commitment and divorce hearings. The appellants argue that they supply the factual basis, rightly or wrongly reasoned, for Chris' belief that his children were against him. The two lower courts, however, concluded that Chris was suffering from insane delusions before these hearings, and that these hearings simply reinforced the decedent's unfounded belief or delusion that he was unappreciated by his family.

From our review of the record, we believe that the concurrent finding of the lower courts that the insane delusions existed prior to the commitment and divorce

hearings is supported by the preponderance of the evidence. The psychiatric reports, the testimony of Dr. Miller, and the testimony of Elizabeth and the children of the marriage, supply a basis for that finding of fact. The lower courts could very reasonably have found that Chris' belief that his family was against him had no foundation in fact or in probability and was wholly a product of Chris' imagination.

That being so, we must decide whether or not this will was a product of that insane delusion, and whether or not Chris devised his property in a way which, except for the delusion, he would not have done. Both lower courts concluded that the will was a product of Chris' insane delusion that his children were against him, and that he devised his property in a way which, except for the delusion, he would not have done.

We conclude that there is sufficient evidence in the record to support the concurrent findings of the two lower courts that the will was a product of Chris' insane delusion. The courts could reasonably have found and did find that, but for insane delusions, the commitment hearing and the divorce proceeding would not have taken place at all. The children of Chris and his wife, Elizabeth, could reasonably have concluded that they had no other choice but to seek a commitment to the hospital so that Chris could receive treatment. There was also sufficient evidence in the record for the lower courts to conclude that, but for Chris' insane delusion, the divorce proceeding would never have taken place.

From our review of the record, we find no other factual basis for Chris' belief that his children were against him. The record discloses that the children were concerned for their father, notwithstanding his view of their interest in him. The lower courts thus could very reasonably have found and did so find that the reason the natural objects of Chris' bounty (his children) were excluded from his will, was solely that at the time of executing his will, Chris was suffering from an insane delusion. This finding is supported by the preponderance of the evidence.

The county court's finding, apparently confirmed by the district court, that the testimony of the children at the commitment and the divorce proceedings should not provide a factual basis for Chris' belief that the children were against him is supported by case law from other states.

A case in point is *Dumas v. Dumas,* 547 S.W.2d 417 (Ark.1977). That case involved an attempt by the daughter and ex-wife of the decedent to set aside a will and a deed on the ground that they were products of an insane delusion. The decedent had been suffering from delusions that the members of his church and his family were against him. The daughter had initiated proceedings which led to her father's commitment in 1969 for a period of time. The court stated in its opinion, "His daughter, apparently very devoted to him, tried to get him medical help, and he turned on her." 547 S.W.2d at 418. Later, the wife divorced the decedent. A month before this divorce, the father executed the will disinheriting his daughter. Despite this commitment proceeding and the pending divorce, the Arkansas court held that there was no basis in fact for the decedent's feelings against his family, and therefore held that the will was a product of an insane delusion.

Another case supportive of the lower courts' findings is *In re Mahnke's Estate,* 6 Wis.2d 508, 95 N.W.2d 405 (1959). In that case, the daughter filed an objection to probate of her father's will on the basis that the will was a product of an insane delusion. The delusion involved in that case was decedent's belief that the neglect of a doctor caring for his wife caused her death and that his daughters had committed perjury in his malpractice suit against the doctor. The court found that that delusion affected the decedent's will in which he expressly made no provisions for his daughters. In its opinion, the court stated:

"There is no evidence from which a sane mind could draw the conclusion of murder, malfeasance in office, perjury, attempted blinding and attempted murder, 'whitewash,' suppression of evidence, and the whole line of accusations made

by him as the testimony and letters received in evidence discloses. There is no evidence from which a sane mind could draw the further conclusion that his daughters were ungrateful and disloyal because they failed to share his warped view and reasoning. There is no doubt that whatever estrangement that existed between the three daughters and the father is coincident with the formulation in his mind of the delusions he harbored. He could not understand and he could not reason that a sane mind could not accommodate the beliefs he held and the wild accusations he made." *In re Mahnke's Estate, supra* at 408.

The reasoning of the Wisconsin court also applies in this case. Here the children did not go along with the insane delusions of their father that their mother was an alcoholic, ran around with other men, and that everybody was against him. Instead of going along with these delusions, three children testified on behalf of their mother at the divorce hearing. Just as in *Mahnke,* the testimony of the children in this case was not what the father wanted to hear. It also should follow that, just as in *Mahnke,* the testimony of the children should not provide a factual basis for Chris' belief that they were against him. The fact that the children in this case did not share their father's insane delusions should not be held against them.

We therefore conclude that the concurrent findings of the two courts that the will was a product of an insane delusion and should be denied probate is supported by the preponderance of the evidence. Finding no obvious and exceptional error in the concurrent findings of the two trial courts, we affirm the judgment of the district court which in effect affirmed the judgment of the county court.

VOGEL, SAND and PAULSON, JJ., concur.

PEDERSON, Justice, concurring specially.

I agree wholeheartedly with the results achieved, which affirmed the judgment of the district court, not for the reason stated by the majority but because the district court's findings of fact were not clearly erroneous. It was not demonstrated that the district court's findings of fact were without substantial evidentiary support nor that those findings were induced by an erroneous view of the law. Rule 52(a), N.D. R.Civ.P.; *Fine v. Fine,* 248 N.W.2d 838 (N.D.1976); *Stee v. "L" Monte Industries, Inc.,* 247 N.W.2d 641 (N.D.1976). See also, *Pettibone Minnesota Corp. v. Castle,* 247 N.W.2d 52 (Minn.1976).

The district court tried this case without a jury and, as required by Rule 52(a), N.D. R.Civ.P., it found the facts specially and stated separately its conclusions of law thereon. From the findings of fact, I am able to obtain a clear understanding of the basis for the trial court's conclusions. See *Ellendale Farmers Union Cooperative Ass'n v. Davis,* 219 N.W.2d 829, 836 (N.D.1974). With or without giving due regard to the opportunity of the district judge to judge of the credibility of the witnesses, I could reach no other conclusion than that those findings are not clearly erroneous.

"If we were to judge from the cold print, we might decide many cases differently than trial judges do, and this case might be one of them. But, if we decided differently, we would have no assurance that ours was the better decision." *State v. Olmstead,* 246 N.W.2d 888, 890 (N.D. 1976).

I cannot accept some things this Court has said about scope of review and related matters in this case, or over the years, nor can I accept a doctrine that appears to say that Rule 52(a) does not mean what it says. There was no appeal to this Court from the probate court judgment and, therefore, none of the probate court's findings of fact or conclusions of law could have been under attack here. Nonetheless, by a tenuous and tortuous route, the majority opinion simultaneously, in effect, reviews findings of both the probate court and the district court and pronounces that they are supported by the preponderance of the evi-

dence.[1] This farfetched strategy was compelled by a hidebound commitment to precedent.

This bothersome precedent is two recent cases which were decided by a unanimous court (including this writer): *Dolajak v. State Auto. & Cas. Underwriters,* 252 N.W.2d 180 (N.D.1977), and *Bach Millwork Co. v. Meisner & Co.,* 228 N.W.2d 904 (N.D. 1975). Without arbitrarily concluding that *Dolajak* and *Bach Millwork* were wrong, I agree with legal writers who have said that it is dangerous to formulate important precedents without an adequate, whole-hearted and controversial presentation of the issue. If the remarks in *Dolajak* and *Bach Millwork* are more than collateral dicta when they, in effect, amend Rule 52(a), then I have to acknowledge the error in my ways and seek a correction for the future. In neither of those cases do I recall any significant argument directed to this issue. We nevertheless proceeded to expound on the proper review of findings of fact based upon documentary evidence, in *Dolajak,* though it is concluded that the question at issue was more one of law than of fact (252 N.W.2d at 182), and, in *Bach Millwork,* though the findings of fact reviewed appear clearly to be conclusions of law (and therefore properly reviewable outside of the strict confines of the "clearly erroneous" rule of Rule 52(a), N.D.R.Civ.P.).

Though Rule 52(a), in its present form, is a relative newcomer in North Dakota, the subject of the proper review of a trial court's decision is not.

" . . . findings of fact of a trial court, like the verdict of a jury, will not be disturbed by an appellate court when they have substantial support in the evidence, . . . and, *where the finding is based upon parol evidence, it will not be disturbed, unless clearly and unquestionably opposed to the preponderance of the testimony. Randall v. Burk Tp.,* (S.D.) 57 N.W. 4. *Of the probative force and value of depositions and documentary evidence, this court may be in as good situation to determine as the trial court;* ·. . ." [Emphasis added.] *Jasper v. Hazen,* 4 N.D. 1, 58 N.W. 454, 455 (1894). See also, *Jasper v. Hazen,* 1 N.D. 75, 44 N.W. 1018 (1890), and *Jasper v. Hazen,* 2 N.D. 401, 51 N.W. 583 (1892).

This, then, was the law when Chapter 82, S.L.1893, provided, in part, that upon appeals from district courts of causes tried without a jury the Supreme Court "shall try the cause anew upon such judgment roll." Trial de novo continued until § 28–27–32, NDCC, was repealed by Chapter 311, S.L.1971. See *Trinity Builders, Inc. v. Schaff,* 199 N.W.2d 914, 917 (N.D.1972).

Shortly after Rule 52(a) was amended into its present form, this Court said, in *In re A. N.,* 201 N.W.2d 118, 121 (N.D.1972):

"It is obvious that the adoption of Rule 52(a) in August of 1971 as an amendment to the existing Rules was designed to set a new standard for reviewing questions of fact—a standard that gives the trial judge more finality of decision. The 1971 session of the Legislature (Senate Bill 2252) abolished the so-called 'de novo' statute. Accordingly, Rule 52(a) was amended to conform to the Federal Rule 52(a) and includes the scope of review given to findings of fact by the trial court. [Footnote omitted.] The Federal Rule applies to any civil action tried without a jury *save* for the exceptions and limitations stated in Federal Rule 81, Wright & Miller, Federal Practice and Procedure: Civil § 2572."

Further comments need to be made about the two recent decisions by this Court, in which I joined with the majority, and which now this Court says resolved the issues by adopting the position expounded by Moore's Federal Practice [*Dolajak, supra,* and *Bach Millwork, supra*]. In *Dolajak* we said that "we further believe that the question here is more a question of law than a question of

---

1. This Court recently considered a case in which the appeal from probate court to district court involved the taking of judicial notice of the probate court file (although there was also oral testimony), but we did not there go so far as to imply that we were concerned about any preponderance-of-the-evidence rule. See *Conway v. Parker,* 250 N.W.2d 266 (N.D.1977).

finding of fact." And, in *Bach Millwork,* we said that there was no evidence in the record to support certain findings of fact. In neither of these cases were we compelled, in order to reach a just decision, to adopt any position to extricate ourselves from a necessity to apply Rule 52(a). Courts have distinguished their own and other courts' rulings for lesser reasons.

Especially when we have no authority to make a de novo review, the function of this appellate court and that of the trial court must be distinguished. Even in those situations where we cannot give due regard to the opportunity of the trial court to judge of the credibility of witnesses (because it saw no witnesses), we are still obligated to give its findings due regard because they are presumptively correct, and we should not set them aside unless we are convinced that they are clearly erroneous. We should not grant trial de novo reviews by calling them something else.

As a part of his article on *The Doubtful Omniscience of Appellate Courts,* 41 Minn. L.Rev. 751 (1957),[2] Charles Alan Wright, Professor of Law, University of Texas, wrote about the two views of Rule 52(a) as follows:

"Such rule has been thought to leave a question, of considerable interest for our purposes, as to the scope of review of the trial court's findings in cases where the evidence was documentary, and where, therefore, the trial court had no special opportunity 'to judge of the credibility of the witnesses.' Some courts have said that in such a situation the appellate court, being in as good a position to judge the evidence as was the trial court, can more readily find the trial court's findings to be clearly erroneous. [Footnote omitted.] Though such a gloss on Rule 52(a) may be regarded as unnecessary [Footnote omitted.], it has at least the merit of being a sound gloss. But then other courts, reasoning from the gloss on Rule 52 rather than from the rule itself, went on to say that the appellate court is

not bound at all, and that review is de novo with no presumption in favor of the trial court's findings, where the evidence below was not oral. [Footnote omitted.]" 41 Minn.L.Rev. at 764.

"Professor Moore, who favors broad review in the situation we are discussing, concedes that the intent of Judge Charles E. Clark, the draftsman of Rule 52, was to have the 'clearly erroneous' test apply regardless of the nature of the evidence . . . ." 41 Minn.L.Rev. at 768.

"In two respects the form of the rule as finally adopted seems to prohibit any distinction between findings based on oral evidence and findings based on documents. First, the rule as finally adopted states positively the test to be applied, rather than adopting by reference prior standards of review in equity. . . . Second, Rule 52 says that findings shall not be set aside unless clearly erroneous *and* due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." 41 Minn.L.Rev. at 769.

Rule 52(a) does not state: "Findings of fact shall not be set aside unless clearly erroneous *if* the trial court has had an opportunity to judge of the credibility of the witnesses." Even if we concede that the appellate court is in just as good a position as the trial court to "weigh" documentary evidence, it does not follow that an appellate court should arbitrarily substitute its view for that of the trial court. See *Pendergrass v. New York Life Ins. Co.,* 181 F.2d 136, 138 (8th Cir. 1950), which held:

"The entire responsibility for deciding doubtful fact questions in a nonjury case should be, and we think it is, that of the district court. The existence of any doubt as to whether the trial court or this Court is the ultimate trier of fact issues in nonjury cases is, we think, detrimental to the orderly administration of justice, impairs the confidence of litigants and the public in the decisions of the district courts, and multiplies the number of appeals in such cases."

**2.** See also, Clark and Stone, *Review of Findings of Fact,* 4 U. of Chi.L.Rev. 190 (1937), and *Scope of Appellate Fact Review Widened,* 2 Stan.L.Rev. 784 (1950).

We have already seen the effect of *Dolajak* on lawyers' arguments, it having been now argued in another case that, even with oral testimony which is not significant, Rule 52(a) should not apply.

The following observation is made at 2B Barron and Holtzoff, Federal Practice and Procedure, § 1132, at 516 (Wright Ed. 1961):

"Despite the clear language of the rule, two Notes by the Advisory Committee, and pointed expressions from the Supreme Court, the authorities are indescribably confused."

That confusion should not justify throwing the baby out with the bath water.

In the cases of *Eichenberger v. Wilhelm,* 244 N.W.2d 691 (N.D.1976); *Ellendale Farmers Union Cooperative Ass'n v. Davis,* 219 N.W.2d 829 (N.D.1974); and *Warner v. Johnson,* 213 N.W.2d 895, 897 (N.D.1973), we "adopted" the Wright & Miller explanation of the purposes behind Rule 52(a).

In *Warner* we said:

"*One purpose* of requiring findings of fact is to aid the appellate court by affording it a clear understanding of the ground or basis of the decision of the trial court. *Another purpose* is to make definite just what is decided by the case in order to apply the doctrines of estoppel and res judicata in future cases. *Finally, and possibly most important,* the requirements that findings of fact be made is intended to evoke care on the part of the trial judge in ascertaining the facts." [Emphasis added].

It appears to me that there would be no purpose in requiring care in the preparation of findings of fact (where the trial court is considering only documentary evidence) if we, in fact, are going to ignore those findings and made a de novo review, reaching our own inferences and conclusions. The majority opinion returns us to a reviewing posture similar to that which prevailed before the abolishment of trial de novo and the adoption of Rule 52(a) in its present form.

I acknowledge that Rule 52(a) is not universally popular amongst lawyers and judges. In 1940, Judge Nordbye presented a paper to the Eighth Circuit Conference in Kansas City on the subject of findings of fact, and from a Michigan commission to study procedure he made the following quote:

"The preparation of findings is burdensome. Special findings of fact, when employed, become the foundation for the judgment, and the evidence cannot be looked to as in equity cases. It results from this that after a case has been properly established by proof that will always be jeopardized and may frequently be ruined in the process of transcribing it into the form of findings." Nordbye, *Improvements in Statement of Findings of Fact and Conclusions of Law,* 1 F.R.D. 25, at 26. (Mo)

That criticism related to the need to prepare findings, and expressed the views of some Michigan lawyers. We have had a similar pessimistic, defeatist reaction from some North Dakota lawyers in our own courtroom when discussing the application of Rule 52(a) to the appellate process.

I attribute the fear of Rule 52(a) to lack of understanding. Distinguishing between a finding of fact and a conclusion of law has always been a most difficult thing.[3] I

**3.** Still, it behooves this Court to exercise the greatest of care to be both consistent and correct in such determinations. In addition to obtaining the proper result for the parties before us, we would provide needed guidance for the bench and bar. An intelligent young lawyer recently noted to us, in a petition for rehearing, that certain of our comments left him feeling like Alice in Wonderland: Alice had been looking over his [the Mad Hatter] shoulder with some curiosity. "What a funny watch!" she remarked. "It tells the day of the month, and doesn't tell what o'clock it is!" "Why should it?" muttered the Hatter. "Does *your* watch tell you what year it is?" "Of course not," Alice responded very readily, "but that's because it stays the same year for such a long time together." "Which is just the case with *mine,*" said the Hatter. Alice felt dreadfully puzzled. The Hatter's remark seemed to her to have no sort of meaning in it, and yet it was certainly English. "I don't quite understand you," she said, as politely as she could. "The Dormouse is asleep again," said the Hat-

do not pretend to have an answer to all of the problems that I see; I merely resist another opinion which appears to me to add to the problem.

I could understand (because of Article VII of the United States Constitution) an attempt to distinguish between the reexamination we make of jury fact-finding and trial judge fact-finding, but we have presumably abolished that distinction. *James River Nat. Bank v. Weber,* 19 N.D. 702, 124 N.W. 952 (1910). What I cannot understand is why we should follow a practice that gives less dignity to a trial judge's findings than we give to findings of administrative agencies, solely because the lawyers stipulated that the district court could try the case upon the record made in the probate court.

ter and he poured a little hot tea upon its nose. L. Carroll, *Alice's Adventures in Wonderland & Through the Looking Glass* 76 (Lancer Books 1968).

It goes without saying that we should make an effort to be understood but in order to do that we may first need to overcome our own dreadful puzzlement.